# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 14-978V
Filed: May 13, 2026

```
* * * * * * * * * * * * * *   *
HARVARD DAVIS,                 *
                               *
            Petitioner,        *
                               *
v.                             *
                               *
                               *
SECRETARY OF HEALTH            *
AND HUMAN SERVICES,            *
                               *
            Respondent.        *
* * * * * * * * * * * * * *   *
```

*Lisa Roquemore, Esq.*, Law Office of Lisa A. Roquemore, Rancho Santa Margarita, CA, for petitioner.
*Lynn C. Schlie, Esq.*, U. S. Department of Justice, Washington, D.C., for respondent.

## RULING AWARDING DAMAGES[1]

**Roth**, Special Master:

On October 14, 2014, Harvard Davis ("Mr. Davis" or "petitioner") timely filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq.[2] (the "Vaccine Act" or "Program"), alleging that the influenza ("flu") vaccination that he received on August 19, 2013, caused him to develop Guillain-Barre Syndrome ("GBS") subsequently diagnosed as chronic inflammatory demyelinating polyneuropathy ("CIDP"). Petition, ECF No. 1 at 2, 7.

Following three days of hearings, a Ruling on Entitlement issued in favor of petitioner on April 27, 2022. ECF No. 169. The matter proceeded to damages. ECF No. 170.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

The parties have agreed upon most of the elements of compensation. The unresolved items are before the Court for resolution. For the reasons set forth below, I find the following damages appropriate: a lump sum of $240,000 for pain and suffering; agreed-upon lost earnings of $336,475; agreed-upon Medi-Cal lien of $1,906,249.80, to be updated; out-of-pocket expenses of $9,270.32, consisting of $2,818.09 in mileage, $1,200 for lawn care, and $5,252.23 in agreed-upon expenses; and monies sufficient to fund petitioner's life care plan.

## I.    Issues to be Determined

The issues in dispute for the Court's consideration include pain and suffering, various life care expenses, and past unreimbursable expenses. *See* Petitioner's Briefing ("Pet. Br."), ECF No. 220 at 2; Respondent's Briefing ("Resp. Br."), ECF No. 221 at 2.

## II.    Factual Background

### A. Procedural History

The early procedural history is set forth at length in the Ruling on Entitlement issued on April 27, 2022, and is incorporated herein by reference. *See* Ruling on Entitlement ("Ruling"), ECF No. 169 at 2-3.

Following the issuance of the Ruling, ECF No. 169, and an order to proceed with damages, ECF No. 170, the parties engaged in settlement discussions for approximately 18 months and resolved many issues of damages. However, the parties determined that a damages hearing was necessary to resolve the rest. ECF Nos. 173-193. The hearing was scheduled, ECF No. 193, settlement discussions continued, and the parties were referred to the Office of Special Masters' Alternative Dispute Resolution ("ADR") Program to resolve and/or narrow the remaining issues in dispute for the hearing. *See* ECF Nos. 206-211.

Pre-Hearing Briefs were filed on May 13, 2024. ECF Nos. 220-221. The damages hearing was held on June 6-7, 2024, in Washington, D.C. ECF No. 225. Thereafter, the parties continued to engage in discussion and filed additional evidence. Pet. Exs. 164-203; Resp. Exs. T-BB. Final submissions were filed on November 12, 2025, December 1, 2025, and December 16, 2025, regarding the unresolved damages. ECF Nos. 294-295. A joint submission specifying the damages and out-of-pocket expenses still in dispute along with each party's position on the disputed items was filed. ECF No. 296.

The matter is now ripe for decision.

### B. Medical History

In-depth details of petitioner's extensive medical history prior to and following his receipt of the subject flu vaccination, affidavits, expert opinions, and testimony at the entitlement hearing are each contained in the Ruling on Entitlement and are incorporated herein by reference. *See* Ruling, ECF No. 169 at 3-29. Petitioner's medical history will only be discussed below where it pertains to specific items of compensation in dispute.

### III.    Legal Framework

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested." *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-92V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *see also* § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury. . . .").

### A.  Pain and Suffering

Compensation awarded via the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). The petitioner bears the burden of proof for each element of compensation requested. *Brewer*, 1996 WL 147722, at *22.

Pain and suffering and emotional damages are "inherently subjective" and cannot be calculated mathematically. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. Apr. 19, 2013). In determining an award of pain and suffering, special masters should consider the awareness of the injury, severity of the injury, and duration of the suffering. *Id.*; *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds,* 70 F.3d 1240 (Fed. Cir. 1995).

In the past, special masters determined pain and suffering on a continuum, where only the most severely injured received the full $250,000 amount available for pain and suffering. *See, e.g.*, *Hocraffer v. Sec'y of Health & Hum. Servs.*, No. 99-533V, 2007 WL 914914, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 28, 2007) (discussing the development of the "continuum of injury" for awards of pain and suffering). This approach was explicitly rejected by the Court of Federal Claims in 2013. In *Graves v. Sec'y of Health & Hum. Servs.*, Judge Merow stated that this approach forced "all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." 109 Fed. Cl. 579, 589-90 (2013). Instead, pain and suffering damages should be assessed independently of the $250,000 statutory limit, after which the cap is "applied." *Id.* at 587-88. Judge Merow determined the appropriate award of pain and suffering damages using the three *McAllister* factors and looking to prior pain and suffering awards made in both Vaccine Program cases and comparable injury cases outside of the Vaccine Program. *Id.* at 589-91. Thus, a special master may look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe*34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case").

### B.  Past Unreimbursable Expenses

A Vaccine Program claimant may recover past actual unreimbursed expenses which:

(i)     resulted from the vaccine-related injury for which the petitioner seeks compensation,

(ii)    were incurred by or on behalf of the person who suffered such injury, and

(iii)   were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(B). The petitioner bears the burden of showing that their requested costs are reasonably necessary. *See, e.g., Brewer v. Sec'y of Health & Hum. Servs.,* No. 1996 WL 147722, *13 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

### C.  Life Care Expenses

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that,

(i)     result from the vaccine-related injury for which the petitioner seeks compensation,

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii)(I). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014) (quoting *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285, at *4 (Cl. Ct. Spec. Mstr. Sept. 18, 1992)); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell*, 1992 WL 266285, *4 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal

imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

## IV.    Analysis

### A. Pain and Suffering

#### 1. Petitioner's Position

Petitioner demands a lump sum of $250,000, arguing that he has "already suffered **well beyond $250,000** of pain and suffering. Pet. Br., ECF No. 220 at 2. Petitioner submits that he has spent "numerous days in the hospital, thousands of hours of infusions, the loss of his mother, the inability to be with her when she passed, and he had no money to bury her." *Id*. Petitioner also cites an inability to work and pay his bills, concerns for becoming homeless, and being unable to enjoy many activities he previously enjoyed, including "driving his Corvette." *Id*. Petitioner was forced to sell his Corvette to pay bills and rent after his friend and housemate, who also cared for him and helped financially, passed away. *Id*.

Following a rent increase in October 2023, his inability to secure government financial assistance, and fear of homelessness, petitioner moved to Georgia and was forced to give up many of his belongings. Pet. Br. at 3. Petitioner claims he had to move in with "strangers in a racially unfriendly State" temporarily "until he received his Vaccine Program funds that would allow him to move back and purchase a very modest home." *Id*.; Pet. Ex. 138.

Finally, petitioner is an adult well aware of his pain and emotional distress. Since his vaccine injury, his life has never been the same. "[B]ut for the cap, Petitioner truly deserves more for the pain and suffering he has gone through already and what he is going to continue to deal with in the future." Pet. Br. at 3.

#### 2. Respondent's Position

Respondent offers a lump sum of $240,000 arguing that petitioner has a host of medical comorbidities "'relevant to pain and suffering, since their ongoing nature means that ***not all . . . post-vaccination suffering can in fact be attributed to the vaccine injury.***'" Resp. Br. At 3 (quoting *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021) (emphasis added)). Respondent does not dispute the significant pain and suffering petitioner has experienced, but the overall facts do not justify the maximum award because petitioner has significant comorbidities that predated his vaccination and have contributed to his post-vaccination symptoms. Resp. Br. at 3-4.

#### 3. Conclusion on Pain and Suffering

Petitioner has a complicated past medical history which includes but is not limited to hypertension, transient ischemic stroke, hypercholesteremia, uncontrolled Type 2 diabetes mellitus ("DM") with peripheral vascular complications and diabetic neuropathy, stress urinary incontinence, chronic neck, back, and hip pain, gastroesophageal reflux disease ("GERD"),

anemia, depression, and vitamin D deficiency. Pet. Ex. 8 at 5-14; Pet. Ex. 4 at 90-91, 113, 119-122; Pet. Ex. 94 at 7, 40, 42; Pet. Ex. 16 at 10; Pet. Ex. 89 at 4. Petitioner underwent five spinal surgeries in 1995, 1999, 2000, 2001, and 2002, including the implantation of a spinal cord stimulator that is no longer functioning, is embedded in scar tissue, and is suspected of causing spinal cord compression resulting in bilateral lower extremity symptoms. Pet. Ex. 10; Pet. Ex. 58 at 2; Pet. Ex. 60 at 3; Pet. Ex. 63 at 2-3. In addition to his vaccine-related CIDP, petitioner's physicians have opined that his diabetic neuropathy and vascular complications contribute to his disabilities along with the prior back surgeries and stimulator presence. Pet. Ex. 9 at 14-18; Pet. Ex. 100 at 12-13. More recent records filed indicate that petitioner also has Parkinson's disease. Pet. Ex. 174.

Petitioner worries about what tomorrow will bring and what is going to happen to him if he does not have the "funds to live a good life or a decent life even." Transcript of Damages Hearing ("Tr."), ECF No. 233 at 48.

Respondent argues that the statutory limit of $250,000 for pain and suffering in every case would be excessive. Although true, each case must be assessed based on its own facts and evidence. *See Graves*, 109 Fed. Cl. at 587-93.

The Vaccine Program discuses two categories of pain and suffering awards: past and projected. *See, e.g.*, *Collado v. Secretary of Health & Hum. Services*, No. 17-0225V, 2018 WL 3433352, at *6–8 (Fed. Cl. Spec. Mstr. June 6, 2018). Petitioner detailed his past and future pain and suffering, what he has already endured, and what he expects to endure claiming that all his suffering is caused by CIDP. He argues that he should receive the full $250,000 available. Pet. Br. at 2-5. Respondent offers a lump sum of $240,000 without allocation to past and future. In *Collado*, the parties similarly did not bifurcate their discussion of past and projected pain and suffering. *Collado*, 2018 WL 3433352, at *8. The special master did not award future pain and suffering for reasons that do not need to be addressed in this case. *Id*. See *Hudson v. Sec'y of Health & Hum. Servs.*, No. 21-1711V, 2022 WL 4137446, at *1 (Fed. Cl. Spec. Mstr. Aug. 8, 2022) and *Commanche v. Sec'y of Health & Hum. Servs.*, No. 19-1409V, 2020 WL 4719198, at *1 (Fed. Cl. Spec. Mstr. July 14, 2020) for examples of flu/GBS Program awards which did not bifurcate past and projected pain and suffering.

A review of pain and suffering awards in GBS cases reveals the highest amount awarded to be $225,000 in June of 2025. *See Janni v. Sec'y of Health & Hum. Servs.*, No. 22-285V, 2025 WL 1984084, at * 3, *8 (Fed. Cl. Spec. Mstr. June 16, 2025) (The amount was more than respondent's offer because petitioner suffered from "acute respiratory failure, an inability to eat, an inability to communicate, a urinary tract infection ('UTI') with resulting sepsis, bedsores, paresthesia, an inability to ambulate, and ultimately death."). Prior to the decision in *Janni*, the highest Program pain and suffering award for GBS was $197,500. *Id*. at *3. Respondent's offer in this case far exceeds either of these amounts for GBS.

While GBS awards serve as a useful comparator, petitioner's injury is CIDP. Many pain and suffering awards for CIDP were based on proffer or stipulation. *See, e.g.*, *Gross v. Sec'y of Health & Hum. Servs.*, No. 17-1075V, 2023 WL 4676976, at *1 (Fed. Cl. Spec. Mstr. June 26, 2023) (CIDP petitioner awarded $196,200 for pain and suffering); *Schultheis v. Sec'y of Health &*

6

*Hum. Servs.*, No. 13-781V, 2016 WL 6835547 (Fed. Cl. Spec. Mstr. Oct. 11, 2016) (pain and suffering award for CIDP was $225,000); *Bartsch v. Sec'y of Health & Hum. Servs.*, No. 13-536V, 2015 WL 8773406, at *1 (Fed. Cl. Spec. Mstr. Nov. 20, 2015) (CIDP/GBS pain and suffering award of $175,000); *Pugh v. Sec'y of Health & Hum. Servs.*, No. 11-901V, 2014 WL 4851907, at *1 (Fed. Cl. Spec. Mstr. Sept. 9, 2014) (pain and suffering award for CIDP was $175,352.30); *Jarvis v. Sec'y of Health & Hum. Servs.*, No. 16-1354, 2019 WL 4649009, at *1 (Fed. Cl. Spec. Mstr. Aug. 27, 2019) (pain and suffering award for CIDP was $195,000).

Petitioner demands the full amount of $250,000 available for pain and suffering: "[I]n the last **10 years**, [p]etitioner has already suffered more than $250,000 of pain and suffering and emotional distress. There is no law that states that any portion MUST be partly attributable to the future." Pet. Br. at 4. Petitioner claims respondent's offer of $240,000 "does not appear to account for future pain and suffering." *Id*. at 2. However, this assertion contradicts petitioner's statement two sentences before acknowledging that he understands respondent's offer to compensate for "both past and future pain and suffering." *Id*. Petitioner also acknowledges that "[r]espondent generally takes the position that one must attribute 'some' pain and suffering and emotional distress to the future and therefore the future amount of pain and suffering is economically discounted." *Id*. at 3-4.

Respondent offers $240,000 in light of petitioner's chronic comorbidities. Petitioner continues to experience a host of comorbidities that are not related to the subject vaccination. However, "'[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award.'" *Janni*, 2025 WL 1984084, at * 3 (quoting *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021)). Here, petitioner continues to suffer the ongoing sequela of his vaccine-related CIDP and continues to receive IVIG treatments to alleviate those symptoms. However, it must also be noted that not all of petitioner's ongoing disabilities are fairly or reasonably attributable to his vaccine-related injury. As noted more fully in the Ruling on Entitlement and above, petitioner has a host of unrelated chronic comorbidities which affect his life and cause disabilities over and above those stemming from his CIDP.

It has been over a decade since petitioner's vaccination and onset of injury. Many of his ongoing medical issues existed before petitioner's vaccination and continued afterwards with increasing disability over time. Petitioner's experiences therefore cannot perfectly compare to those of the petitioner in *Janni*. There, the petitioner was awarded $225,000 for pain and suffering, among the highest GBS pain and suffering awards in the Program, for his acute medical issues which caused extreme discomfort and distress and ended in death. However, the special master also noted that the petitioner's "injury did not persist for months, or even years," as is the case with Mr. Davis. *Janni*, 2025 WL 1984084, at *8.

Ultimately, "[t]here is no formula for assigning a monetary value to a person's pain and suffering and emotional distress" and "pain and suffering is not determined based on a continuum." *Miles v. Sec'y of Health & Hum. Servs.*, No. 20-146V, 2023 WL 21155, at *2 (Fed. Cl. Spec. Mstr. Jan. 3, 2023) (citations omitted). Perfect comparators are not abundant in the Program for pain and suffering awards, which has been noted by other special masters. *See Holmberg v. Sec'y of Health*

7

*& Hum. Servs.*, No. 21-1132V, 2024 WL 4607929, at *3 (Fed. Cl. Spec. Mstr. Oct. 7, 2024) ("Only a small minority of cases involved a special master's adjudication of damages issues."). There are precious few reasoned damages decisions in the Program in the context of CIDP.

Respondent's offer exceeds even the highest pain and suffering awards for GBS in the Program. However, I will not disturb the offer made by respondent. Petitioner acknowledged respondent's lump sum offer as intended to compensate petitioner for all past and future pain and suffering. I therefore find $240,000 to be an appropriate award for all past and future pain and suffering associated with petitioner's vaccine-related injury of CIDP.

Accordingly, petitioner is awarded a lump sum of $240,000 for past and future pain and suffering.

## B. Life Care Expenses

Actual and projected expenses permitted under § 15(a)(1)(A)-(B) are those expenses incurred as a result of the vaccine-related injury that are deemed to be reasonably necessary to meet the basic needs of the injured person but short of what may be required to optimize their quality of life.

The parties agree that a life care plan is required. Joint Statement, ECF No. 296 at 2. The final life care plans were filed in June and September 2025, respectively. Pet. Ex. 192; Resp. Ex. X. Respondent's submission and life care plan includes petitioner's life care plan items, the items covered by Medicare and Medigap, respondent's agreement or disagreement with each item contained in petitioner's life care plan, and additional items offered by respondent that were not included in petitioner's plan. Resp. Ex. X.

The parties submitted two final charts. One chart includes all the disputed future care items and the party's respective positions regarding those items. The other includes all the final future care items which have been agreed upon. Resp. Ex. CC; Resp. Ex. Y.

To better understand the reasoning for my decisions below, I include a list of the agreed upon life care plan items which include: Medicare premiums; cost of medical providers; IVIG infusions; blood work; medications; incontinence briefs; gloves; wipes; bed pads; counseling evaluation and sessions; physical, aquatic, and occupational therapies; installation and monitoring services of a home automation and security system; AFOs; adaptive tools and supplies for activities of daily living, including compression socks, bathing aids (bath bench, handheld shower sprayer, grab bars), reachers, gait belts, adaptive tools for hygiene, drinking, and eating, bedside commode, wheeled walker with seat, canes, battery powered scooter and batteries, light weight wheelchair, portable wheelchair ramp, plastic mattress covers, a stand and lift recliner; and mileage to petitioner's PCP, podiatrist, endocrinologist, PT, counseling, and infusion center. Resp. Ex. Y; Resp. Ex. X. Those items covered by Medicare or Medigap are designated with an "M."

Presented to the Court for resolution are those items the parties agreed were necessary but the cost and/or frequency of replacement were in dispute, including: disposable garbage bags; in-home attendant care; case management; scooter lift; grab bars; air travel to Culver City for

petitioner and a caregiver to see petitioner's neurologist, including hotel, food, and ground transportation. Also presented for resolution are those items the parties disagreed were necessary, including: the purchase of a "reliable [motor] vehicle;" bed frame and mattress; home modifications, handyman, yard care, and heavy-duty house cleaning. Resp Ex. X at 11-15, 17, 19, 20-22.

Each party retained his own life care planner. Petitioner retained Ms. Kattman, a certified financial planner, familiar with the requirements of the Vaccine Program. Pet. Ex. 158. Ms. Kattman agrees projected future expenses must be for items that are reasonable and vaccine-related and include: "Rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional and behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities." Tr. at 154-55, 183-84. She also believes that a person should be allowed to live in their own home and be provided with the things that would permit them to do so and be productive; she nevertheless acknowledges that the governing statute does not provide for that. Tr. at 155.

Ms. Kattman prepared her life care plans in this case following review of the medical records, conversations and site visits with petitioner, conversations with petitioner's treating physicians and caregivers, continuing review of information over the years, and research of services and costs in petitioner's home area of Sacramento. Tr. at 89, 102-108.

Respondent retained Ms. Curtis who is a certified life care planner, nurse, and case manager. Tr. at 153, 213-217; Resp. Ex. I. Ms. Curtis reviewed all the records filed, conducted site visits, reviewed Ms. Kattman's life care plans and supporting documents, and heard the testimony. Tr. at 218-219. Ms. Curtis's goal in preparing life care plans is to provide recommendations that are reasonable, medically indicated, specific to the vaccine-related injury, and not speculative. Her recommendations in this case are meant to be comprehensive, meet the petitioner's needs, and maximize his independence and ability to function in a safe environment. Tr. at 218, 242-243, 272.

Ms. Kattman, Ms. Curtis, and petitioner's current treating neurologist, Dr. Shaoulian, describe petitioner as articulate, intelligent, able to communicate effectively, knowledgeable about his medical conditions, and able to function with activities of daily living while receiving IVIG treatment. Tr. 158-159, 225-226, 232-233; Pet. Ex. 195 at 4. Ms. Kattman and Ms. Curtis agree that, when petitioner was living in his single-level rental home that he had lived in for many years, he was able to navigate well with a walker. Tr. at 158, 192, 225. Upon his return from Georgia in March of 2024, he moved into the home of a friend, Ms. Jesse, and now lives in a small upstairs bedroom with little room to move around and a bathroom down the hall. Tr. at 54, 90, 274.

The items requiring resolution contained in the life care plan include: 1) attendant care; 2) scooter lift and purchase of a "reliable [motor] vehicle"; 3) home modifications; 4) disposal garbage bags; 5) case management services; 6) grab bars; 7) adjustable bed frame and mattress; 8) handyman services, yard care, and cleaning; and 9) travel-related expenses for neurology visits to Culver City, California.

9

### 1. Attendant Care

The parties agree that in-home attendant care is necessary but disagree about the number of hours required. The following will also affect petitioner's claims for out-of-pocket expenses discussed more specifically below.

Petitioner's life care plan provides for 24-hour attendant care, 365 days per year, or 168 hours per week, minus 14 hours per week for the two days that petitioner is at the infusion center. This is reflected in the cost of $329,312.00 per year for life, plus an additional 15 hours for four days per year for travel to Dr. Shaoulian in Culver City at a cost of $1,230 per year for life. Resp. Ex. CC at 1.

Respondent's life care plan provides for 13 hours per day of attendant care, or 91 hours per week, 365 days per year at a cost of $185,055.00 for life, and 15 hours for one more year of travel to Dr. Shaoulian at a cost of $1,230.00. Resp. Ex. CC at 1.

Ms. Kattman and Ms. Curtis agree that $39 per hour is appropriate for the level of attendant care petitioner requires. Tr. at 102.

### a. Assessments by the State of California for In-Home Supportive Services ("IHSS")

Petitioner applied for IHSS funding for in-home care on September 15, 2014, and has received continuous IHSS funding since that time. *See generally* Pet. Ex. 174; Tr. at 20-22; Pet. Ex. 133 at 4. Based on documents filed as of October 10, 2024, petitioner was receiving 175.45 hours per month, or 43.45 hours per week, to be scheduled as he chooses. Pet. Ex. 175; Tr. 20-22; Pet Ex. 133 at 4. Ms. Jesse's billing records show that petitioner is currently receiving 186.36 hours per month, 46.59 hours per week, or approximately six hours per day. Pet. Ex. 201 at 3.

IHSS conducted assessments to determine petitioner's needs for all his disabilities and included a checklist of items marked off, which reflect services deemed to be necessary for petitioner, with the time provided for each service. *See* Pet. Exs. 174 and 175. Petitioner has been provided service time for domestic services such as light house cleaning, meal preparation, meal cleanup, routine laundry, food shopping, other errands such as prescription pick up, bowel and bladder care, including transfers to the toilet, ambulation, bathing and grooming, rubbing skin for circulation, setting up medications, and being accompanied to and from medical appointments. There were no services provided for heavy cleaning, yard work, snow and ice removal, or education. Petitioner's hours increased over the years from 103.01 hours per month from his initial assessment in September 2014 to 186.36 hours per month reflected in IHSS current billing records for payments to Ms. Jesse. *See* Pet. Ex. 174 at 29-31, 51, 97, 88-93, 101, 105, 236-239, 377-381, 427-428; Pet. Ex. 201 at 3.

The updated assessment presumably reflecting petitioner's current living conditions at Ms. Jesse's home was not provided. However, a prior assessment performed on February 15, 2023, stated that petitioner lived in a single-family home with six rooms. Pet. Ex. 174 at 368-372. At the time of the assessment, petitioner was alone, well groomed, ambulated with two canes, and his

home was clean with no safety hazards observed. *Id*. at 378. He reportedly lived alone, but his caretaker and friend Ms. Jesse lived nearby and was available to check in on him. *Id*. He had a shower chair, walker, raised toilet, four-prong cane, two canes with arm support, leg braces, wrist braces, Dexcom port for insulin administration, and glasses. *Id*. His conditions included but were not limited to: Parkinson's disease, insulin dependent diabetes, incontinence, CIDP, right-sided weakness from stroke, tremors, swallowing issues, blood transfusions monthly, IVIG infusions twice per week, constant weakness, and fatigue. Per petitioner, he could not stand for long periods of time, his vision was getting worse, and he had numbness and weakness in both hands with difficulty grasping. *Id*. at 379. His needs were assessed and a chart of minutes per service required was created. *Id*. at 379-384, 388-389. Petitioner was provided 175.18 hour per month, or 43.5 hours per week, of in-home attendant care. *Id*. at 385-386. Any hours beyond that amount would be petitioner's financial responsibility. *Id*.

Ms. Kattman acknowledged having little information on IHSS in California, other than knowing it would not provide for 24-hour care or for all of petitioner needs. Tr. at 152, 174. Ms. Curtis agreed IHSS would not provide 24-hour care, but that the more than 40 hours per week provided was based on a home assessment. Ms. Curtis was providing 91 hours per week, more than twice the care petitioner is currently receiving from IHSS. Tr. at 258-259, 295-296, 311.

Ms. Kattman's recommendation for 24 hours of care per day was based on her conversations with petitioner, his medical providers, and caregivers, and review of petitioner's medical records. Tr. at 91-93, 102-108; Pet Exs. 134-135, 174-175. Petitioner advised Ms. Kattman that he needs care at night, cannot be left alone safely, and that "Dr. Belsky indicated he required 24-hour care because of his weakness and deficits from the CIDP." Tr. at 93. In keeping with the "standard of practice," Ms. Kattman spoke with Dr. Belsky about how age might affect petitioner. Dr. Belsky stated age might accelerate a likely need for 24-hour care. However, none of petitioner's doctors said that 24/7 care was necessary. Tr. at 93-94, 176-177. While Ms. Kattman stated that petitioner has difficulties with many activities of daily living, she "think[s] there is [sic] several activities of daily living that there's no question that he can perform." Tr. at 176.

Ms. Kattman maintained there was no way to allocate 13 hours per day to all of petitioner's needs because life is not static and over the years conditions change. Tr. at 109, 98. She recommended 24-hour attendant care to allow petitioner to do the things he would not otherwise be able to do, including social and recreational activities. Tr. at 165.

Ms. Curtis agreed that petitioner needs assistance with bathing, dressing, meal preparation, laundry, light housekeeping, and transportation but noted that he does travel alone by Uber when necessary. She stated when considering all the agreed-upon care being provided in the life care plan including comprehensive medical care, physical, occupational, and aquatic therapies, and equipment to promote independence and facilitate a more functional home, 91 hours per week of attendant care to be allocated as he chooses is sufficient. Tr. at 244. Further, respondent is providing for a case manager who can create a schedule to meet all of petitioner's needs. *Id*. Petitioner also spends 14 hours per week or seven hours per day twice weekly at the infusion center receiving IVIG treatments where he is cared for by the nurses on staff. Tr. at 245.

11

Ms. Kattman argued that petitioner requires a caregiver at night for episodes of incontinence, getting out of bed, going to the bathroom, and administering medications due to dexterity problems, particularly on infusion days when his sugar levels are harder to control. Tr. at 178-181, 201-202; Pet. Ex. 137 at 3; Pet. Ex. 146 at 4.

Ms. Curtis agreed that petitioner may urinate more frequently on infusion days from the fluids given and provided a bedside urinal to assist with that. Tr. at 237-238. She also agreed the excess fluids may lead to some diarrhea but found it concerning that none of petitioner's medical records document this as an issue; she noted that, because petitioner has diabetes, this could cause significant problems and should be addressed medically. Tr. at 237-238, 291-292. Further, on infusion days, because petitioner is cared for by the nursing staff at the infusion center during much of the day, he can schedule his attendant care for overnight for his needs. Tr. at 231, 257.

Ms. Curtis further disagreed that petitioner needs round-the-clock care for diabetes medication administration. Tr. at 256-257. She noted at the time his medications included Trulicity once per week, Lantus at night, which is long-lasting and meant to maintain consistent blood sugar levels throughout the night and morning hours, and Novolog, which is fast acting before meals and coffee. Tr. at 229-230.[3] Ms. Curtis added that patients with diabetes often have dexterity and vision problems, like petitioner, and diabetes medications are typically administered by pen for that reason. With proper therapies and education, petitioner can administer these medications on his own. Tr. at 230-231. Ms. Kattman agreed that petitioner's most recent medical records show petitioner's sugar levels are 80% stable. Tr. at 179-181, 227-229, 257, 308-309; Pet. Ex. 137 at 3; Pet. Ex. 146 at 4.

The life care planners agreed that petitioner returned to California two days prior to their site visit. Petitioner was noted to be fatigued from the trip but had flown the last leg of the trip alone, with presumed airport assistance, and was picked up at the airport by private car. Tr. at 156-157, 223, 279-280. They also agreed petitioner had taken Ubers to the infusion center alone, can get in and out of a car, and can walk on his own with two canes despite problems with stairs and a risk of falling. Tr. at 158-159, 236, 239, 286-289; Pet. Ex. 161 at 28. Ms. Curtis referred to the most recent infusion center records as documenting petitioner to be independent with ambulation, transfer, toileting, bathing, dressing, and eating during visits by various nurses. Tr. at 309-310; Pet. Ex. 161 at 27-28, 53, 75-76. Ms. Kattman claimed the records were not accurate or consistent. Tr. at 312. Ms. Curtis added that petitioner can use a phone to call an Uber, and both agreed he can hold a pen to sign his name. Therefore, Ms. Curtis stated that petitioner has enough fine motor control that, with proper training and therapies, he can learn to administer his own diabetes medications by pen. Tr. at 236, 225-226, 281.

Ms. Curtis added that, in addition to 13 hours per day of attendant care, she has provided for a home automation and security system and a lifeline monitoring system. Tr. at 246. The lifeline monitor, worn around the neck, provides access to emergency services if needed. Because petitioner's cognitive and verbal abilities are intact, he can communicate with emergency services. If a fall is detected and petitioner cannot be reached, emergency services are sent. Tr. at 247-248.

---

[3] Petitioner's 2025 medical records show that Lantus was discontinued due to controlled sugar levels. He takes 10 units of Humalog with coffee, a bagel, and lunch, and five units at dinner. He receives 4.5 mg of Trulicity weekly and his Dexcom measures sugar levels with no complications. Pet. Ex. 200 at 35.

The home automation and security system will enable petitioner to control his environment, including the lights and thermostat, and he can see who is at the door through security cameras. The system can be voice activated and controlled by a phone or tablet. Tr. at 248-249. Both the lifeline and automation system can be used wherever petitioner lives. Tr. at 249.

Ms. Kattman argued that the lifeline system is inadequate because petitioner is a fall risk and it would not *prevent* a fall. She agreed it would detect a fall and send emergency services if he did not respond.[4] Tr. at 127-128, 171. Ms. Kattman agreed the home automation system would promote independence. Tr. at 128, 171-172.

Ms. Kattman, Ms. Curtis, and petitioner's current neurologist, Dr. Shaoulian, agree that physical and occupational therapy would improve petitioner's strength and educate him on safe transfers and mobility around the home. Tr. at 173, 249-250. Ms. Kattman agreed that these therapies provide people with "compensatory strategies so that they're safe." Tr. at 173-174. Ms. Curtis stated that petitioner's medical records show he has not participated in any form of physical or occupational therapy since 2018. And while therapies would not return petitioner to 100%, they would provide more independence by strengthening and educating him on safer transfers and ambulation using the medical equipment being provided in the life care plan. Strengthening exercises increase function and balance and reduce the risk of falling. Tr. at 250-251. Further, petitioner's use of two canes is not appropriate for anyone; he would be more stable using a walker, which he previously had, along with a manual wheelchair. Ms. Curtis added that the life care plan includes a lift chair to make it easier for petitioner to get up. Tr. at 255. She agreed that petitioner is a fall risk and that balance issues increase with aging. But physical therapy, strengthening for muscle memory, and education minimize the risk of falls, while simple exercises increase fine motor movement. Tr. at 256, 250-251, 292, 310-311. All the therapies are covered by Medicare. Tr. at 250-251.

Ms. Curtis disagrees that 24-hour-per-day care is necessary and summarized the many interventions and assistive devices provided for in the life care plan. Tr. at 253-254. 13 hours per day is sufficient to provide petitioner with assistance bathing, dressing, putting on his compression stockings, making breakfast, preparing lunch, assisting with more complex meals, taking him to the bathroom, and leaving out snacks. Tr. at 245-47, 290. The life care plan provides for adaptive equipment for bathing, showering, and toileting, including grab bars, shower and bath bench, handheld shower head, reacher, AFOs, canes, a walker, motorized scooter, and a manual wheelchair. Tr. at 251-253. Physical therapy will teach petitioner how to transfer safely including how to get up and down from furniture and in and out of bed and vehicles. He will have a lifeline and a home automation and security system. With all the foregoing and an attendant 13 hours per day, his fall risk is significantly reduced. Tr. at 245, 255. Occupational therapy will provide more dexterity so that he can administer his own diabetes medication if necessary. Tr. at 283. Ms. Curtis concluded that the goal in dealing with those with disabilities is to make the individual as independent as possible and promote their self-esteem and mental health. Tr. at 245, 253. Petitioner's life care plan includes counseling sessions to help him deal with stress. Tr. at 252-253. 24-hour care is generally provided for those who are non-verbal, cannot communicate their needs,

---

[4] Petitioner testified that he fell on two recent occasions. Both times, he was with his aide and both times he hit the floor. On one occasion, petitioner took the aide down with him. Tr. at 34-35.

are on a ventilator, and need constant monitoring due to an unstable airway. This is not petitioner's situation. Tr. at 254.

### b. Petitioner's Testimony and Declaration

Petitioner testified, "I need help for . . . 15 hours a day." Tr. at 26. IHSS provides hours "depending on . . . what your needs are. Anything over and above that, you are going to have to get someone from the outside." *Id*. IHSS provided 178 hours per month or five hours per day based on their assessment. Tr. at 56. After several variations from petitioner for how and by whom the assessment for his IHSS hours is done, he finally stated that someone from IHSS comes to the house, conducts a site visit every year, goes over medications, safety issues, and contact information, discusses the various things he needs help with, and then allocates the number of hours he needs. Tr. at 56-58. Petitioner stated that he had not had an assessment since moving back to California from Georgia in March of 2024.[5] Tr. at 58.

Petitioner stated that his caregivers make sure he is showered, dressed, has water, and is cleaned at night if he has an accident. They rub his legs for circulation, change his linens, assist him to the bathroom and on and off the toilet, give him his medications because he cannot see the labels and fumbles with the lids, test the shower water because of his loss of sensitivity to hot and cold, monitor his sugars through the Dexcom on their phone, carry his glucose pens, iron his jeans, make him breakfast, do his laundry and grocery shopping, pick up his prescriptions, schedule his appointments, and pay his bills. Tr. at 6-7, 28, 30-32, 33, 34, 39, 65-66; Pet. Ex. 138 at 4. His caregiver stays with him during infusions because the caregiver "gives me some relief and gives me some company, too," but agreed the nursing staff is there for all his needs. Tr. at 33, 36-38, 62-65. He agreed he has taken Ubers and attended infusions alone when his caregiver was unavailable. Tr. at 62.

Petitioner stated he needs a caregiver overnight because he cannot sleep, needs food, water, or assistance to the bathroom and to be cleaned after accidents. Pet. Ex. 138 at 4. He is stronger after receiving the infusions of IVIG but suffers from diarrhea on infusion nights. *Id*. Because he has trouble "do[ing] tasks of daily living," his caregivers cook, clean, shop, run errands, attend infusions, bathe him, shave him, put on and take off his braces, flip his mattress, assist with transfers, lay out his clothes, take him to medical visits, take out the garbage, and help him up and down the stairs. *Id*. He claimed to have "no quality of life," and needs the "funds to live a good life or a decent life even." His life would be simpler with reliable caregivers he could count on to deal with everyday tasks such as groceries, paying bills, and traveling with him to his neurologist so that he does not have to worry about anything and someone is with him if something happens. Tr. at 48-50.

### c. Letters from Petitioner's Treating Physicians

Petitioner filed letters from Drs. Shaoulian, Belsky, and Chung which state that he requires 24/7 care. Pet. Ex. 141; Pet. Ex. 143; Pet. Ex. 147.

---

[5] This does not explain the letters petitioner received in July 2024 and October of 2024 advising him of the updated hours being provided or Ms. Jesse's current billing at 186 hours per month. However, the last assessment filed was from February of 2023. Pet. Ex. 174; Pet. Ex. 175.

Dr. Chung, a primary care physician in Georgia, wrote on March 1, 2024, "To Whom it May Concern," petitioner has "a lot of medical conditions that qualify him for 24 hour nursing services." Pet. Ex. 141 at 1. He has CIDP that is progressive and requires routine IVIG transfusions. He is a high fall risk, has fallen several times injuring himself, and struggles with ADLs. *Id*.

Dr. Shaoulian wrote on April 8, 2024, "To Whom It May Concern," petitioner "has CIDP. He has lower extremity weakness and loss of balance. He is having falls. He is having difficulty doing his ADLS like getting dressed and preparing his meals. He would benefit from having 24 hour home health care."[6] Pet. Ex. 143 at 3.

Dr. Belsky wrote two letters on April 18, 2024. The first: "To Whom It May Concern: Harvard I Davis III has been under my care. He currently struggles with weakness and is at significant risk of fall. He requires 24 hour care." Pet. Ex. 147 at 1. The second letter added: "Due to his chronic medical illness, he requires the following home accommodation/changes: ramps to access front and back of dwelling; grab bars in bathrooms; wheelchair accessible, roll-in shower; raised toilet." *Id*. at 2.

A letter dated June 11, 2024, was filed from the director at the infusion center, stating: "To: Whom this may concern [petitioner] is a patient at the Infusion Center. . . . He is completely dependent for his activities of daily living. His dependency is as described: food prep, eating, cleaning, bathing, bathroom assistance, dressing, shopping, traveling, transferring from the wheelchair to chair, mobilization, and adherence to medical regiment." Pet. Ex. 165. This letter is inconsistent with the nursing notes from the infusion center. *See, e.g.*, Pet. Ex. 161 at 53 (noting petitioner does not "have difficulty with toileting, bathing, dressing or eating," and is described as independent for ambulation, transferring, toileting, bathing, dressing, and eating).

### d. Conclusion

Neither Ms. Kattman nor Ms. Curtis requested any the above-referenced letters. They did not believe that any of petitioner's doctors visited petitioner at home or were provided with or knew the extent of interventions being recommended for petitioner in the life care plans. Tr. at 95-97, 176-177, 307-308; Pet. Ex. 141; Pet. Ex. 143; Pet. Ex. 147. Ms. Curtis added that requirements for in-home care are not within doctors' expertise, but treaters often try and help their patients when asked to do so. However, nothing in petitioner's medical records supports the need for 24-hour care. Tr. at 307. At the hearing, petitioner confirmed the letters were written after he advised his treaters of the things he believed would make his life more comfortable. He confirmed that none of the doctors visited him at home or reviewed the life care plan recommendations. Tr. at 67-69. Therefore, it appears that these letters were written at petitioner's request with little basis for their content offering little in assisting with petitioner's actual needs. *See Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) (finding that the testimony of a treating physician is not "sacrosanct"); *Ruiz v. Sec'y of Health & Hum. Servs.*, No. 02-156V, 2007 WL 5161754, at

---

[6] This letter was written on the same day petitioner flew to Culver City to see Dr. Shaoulian, after returning from Georgia and after not having received IVIG for 5 months. *See* Pet. Ex. 144 at 5.

*15 (Fed. Cl. Oct. 15, 2007) (special master was not arbitrary in rejecting a statement of a treating doctor that was given years after treatment ended and only in the context of litigation).

Petitioner's medical records do not support the need for 24-hour care. Notably, Dr. Chung's letter refers to the need for 24-hour "nursing" care. Dr. Chung is a primary care physician at Advent Health Medical Group in Georgia where petitioner lived for five months. The only record filed from Dr. Chung was dated March 1, 2024, and refers to a "face-to-face" evaluation, an order for a "Four wheel walker" and a diagnosis of "Gait Instability." Pet. Ex. 140 at 1. There were no details of the visit, no history, no examination notes, and no documented need for 24-hour "nursing" care. *Id*. The most recent life care plan authored by Ms. Kattman however references a visit with Dr. Chung on October 31, 2023, to establish care for CIDP, iron deficiency anemia, steroid induced DM, other iron deficiency anemia, history of stroke, screening for prostate cancer, erectile dysfunction, chronic hip pain, chronic back pain, sleep apnea, and acid reflux. This record was not filed. Pet. Ex. 152 at 4. Therefore, it appears that Dr. Chung may have seen petitioner more than once, but the medical history was based on what she was told by petitioner rather than any review of his prior medical history and medical records.

Dr. Shaoulian's 2024 and 2025 records confirm that when petitioner receives IVIG twice weekly he walks better with two canes and has significant improvement in upper and lower body strength and pain vibration sense. Pet. Ex. 144 at 6; Pet. Ex. 136 at 1. On examination, petitioner has 5/5 strength in all extremities, normal sensory to vibration, decreased pain sensation to the knees, and zero reflexes throughout with normal rapid alternating movements. He can stand pushing on his cane but drags his legs. Pet. Ex. 144 at 5. Ms. Kattman testified that neither Dr. Shaoulian nor Dr. Belsky stated that 24-hour care was medically necessary or that petitioner could not perform activities of daily living. Indeed, she believes there are "several activities of daily living that there's no question that [petitioner] can perform." Tr. at 176. The record does not include the need for 24-hour care.

Petitioner's current diabetes medications include 10 units of Humalog with coffee and a bagel and lunch, five units at dinner, and 4.5 mg of Trulicity weekly. Lantus, a long-acting medication previously prescribed for overnight use, has been discontinued and his Dexcom measures sugar levels with no complications. Pet. Ex. 200 at 35; Tr. at 229-230. His diabetes is 80% controlled. Pet. Ex. 200 at 35, 39. Further, with the provided therapies, petitioner will be able to administer his own medications by pen. Tr. at 230-231. In addition, petitioner's medical record includes that he has not been accompanied to medical visits since the death of his friend in November of 2022. Pet. Ex. 200 at 35. His medical providers attribute his neuropathy to CIDP and diabetes, but he has "full capacity." *Id*. at 28.

IHSS is currently providing petitioner with 186.36 hours of in-home care per month, or approximately 45 hours per week or 6.4 hours per day. Pet. Ex. 175; Tr. at 20-22; Pet Ex. 133 at 4; Pet. Ex. 200.

IHSS was addressed in *Lerwick v. Sec'y of Health and Hum. Servs*, in which the special master noted that California has established an admirable system to care for disabled individuals. *Lerwick*, 2014 WL 3720309, at *8. While Ms. Kattman conceded to having little information about IHSS in California, Ms. Curtis confirmed that 40 hours per week of in-home services provided by

16

IHSS had to be based on an in-home assessment. Tr. at 152, 174. At the time of the hearing, petitioner confirmed that in-home assessments were done, but none had been done since he moved in with Ms. Jesse in March of 2024. Tr. at 56, 58. The increase to 186.36 hours monthly suggests that an in-home assessment has been done of petitioner's current living arrangement with Ms. Jesse. However, no assessment since February of 2023 has been filed. Thus, as the special master stated in *Lerwick*, while the California's system is not necessarily perfect, it is a reasonable starting point.

While IHSS is providing 186.36 hours per month, or 6.4 hours per day, of in-home care, on his own initiative, petitioner entered into agreements with non-medical individuals to cover 24 hours per day of care to make his meals, do his shopping and laundry, pick up his prescriptions, pay his bills, schedule his appointments, assist him with dressing and showering, put on and take off his compression socks and AFOs, change his sheets, provide his medications as prescribed, monitor his sugar levels on their phone, act as chauffeur, and essentially serve as his 24-hour companion. Petitioner's medical records do not document the need for 24-hour care and much of the care being provided is not medical, rehabilitative, or custodial in nature. Special masters are authorized to award compensation for only "reasonably necessary" services.

Respondent's life care plan provides 91 hours per week, or 13 hours per day, of attendant care, twice that being provided by IHSS. The agreed-upon life care plan items include therapies to strengthen petitioner and assist with balance, assistive devices, monitoring devices, and an automated security system to make him more independent. Ms. Kattman's argument for 24-hour care contradicts a life care planner's goal in promoting the individual's independence and is contrary to what petitioner advised her he was striving for: "equipment and accommodations to live as independently as possible" with the understanding "he would need assistance for basic and other activities during the day." Tr. at 139. Respondent's plan is more in keeping with petitioner's stated goals and promotes independence. Petitioner's plan for 24-hour attendant care promotes dependency.

In my experience as a practitioner in this Program for many years, and as a special master for over a decade, 24/7 care is awarded only to the most vulnerable, severely injured individuals incapable of caring for themselves in any way, such as infants, children, adults on ventilators and feeding tubes, and adults who have lost the use of their arms and legs entirely. In other words, 24/7 care is appropriate only for those with no ability to care for themselves. This is not the case here.

The agreed-upon life care plan items are extensive in promoting independence. The life care planners and petitioner's treating physician, Dr. Shaoulian, agree that, with therapies and education, petitioner can gain the strength, dexterity, and balance to achieve a level of independence and self-confidence to participate in a life he enjoys if he is willing to participate. The goal of a Program recovery is not to make one's life better than it would have been if not for the vaccine-related injury. I find that 91 hours per week of attendant care, along with all of the other agreed-upon items, will more than accommodate petitioner's needs and provide him with the independence to participate in his social and community activities.

17

## 2.  Scooter Lift and a Reliable Vehicle

The parties agree on a scooter lift for a vehicle but disagree on the cost of the lift and whether petitioner is entitled to a "reliable vehicle."

### a.  The Positions of the Life Care Planners

Ms. Kattman's life care plan includes a reliable vehicle now and every seven years through life expectancy at a cost of $47,278 for each vehicle and a scooter lift now and every seven years through life expectancy at a cost of $2,800 each. Pet. Ex. 192 at 10.

Respondent's life care plan includes a scooter lift at a cost of $1,384 now and every ten years through life expectancy. A reliable vehicle is not included. Resp. Ex. X at 15.

Ms. Kattman noted that petitioner cannot drive and stated that he sold his Corvette when it became inaccessible over the years. Tr. at 116-117. Her life care plan includes a vehicle so the scooter lift can be attached to it. Tr. at 117-118. If petitioner was to acquire a car, someone else could drive him. Tr. at 159. Ms. Kattman ultimately agreed that a personal vehicle would be a routine expense for petitioner. Tr. at 160.

Ms. Curtis stated that she provided a scooter lift which can attach to a regular car or small SUV as well as a walker and manual wheelchair, both which can fold and fit in the trunk of any vehicle. Tr. at 258-262, 296-297. Ms. Curtis argues that the purchase of a vehicle however is a routine expense not covered by the Program. Tr. at 262, 297.

Regarding the disparity in the cost of the scooter lift, Ms. Kattman advised that Ms. Curtis used a sale or discounted price, which is not permitted by the tenets and consensus statements for life care planning. Tr. at 118. Her back-up documents show that the scooter lift retails for $2,800 but Ms. Curtis used a $1,384 discounted rate. Ms. Kattman stated that it is customary to use the average of two or three costs for which an item may be purchased. If a sale price is used, it may not be available at that price at time of purchase. Tr. at 118-119; Resp. Ex. Q at 7.

Ms. Curtis stated that she routinely uses the company Spinlife for these items. Spinlife always has discounted rates, is a reputable site with "fairly consistent pricing," and is in keeping with the vaccine guidelines for the most cost-effective items. Tr. at 262.

### b.  Petitioner Testimony and Declaration

Petitioner declared that he no longer drives because his legs start to quiver during stop-and-go traffic and he no longer has the capacity to grip the steering wheel the way he used to. Pet. Ex. 138 at 5. Petitioner sold his car to pay his bills. Pet. Ex. 138 at 4.

### c.  Conclusion

Over the years, friends and caregivers have driven petitioner, or he has called a ride share service. The life care planners agree to the purchase of a motorized scooter and scooter lift. They

18

also provide for a walker and manual wheelchair both of which fold and can be transported in the trunk of any car.

The Program has on occasion compensated a petitioner in need of an accessible vehicle for purposes of transporting a motorized wheelchair. Even in those circumstances, the recovery was limited to the incremental cost of the modified vehicle over a standard car, and only that portion of use attributed to petitioner, recognizing that the vehicle would also serve the general family. *Scheinfield v. Sec'y of Health & Hum. Servs.,* No. 90-212V, 1991 WL 94360, at *3 (Fed. Cl. Spec. Mstr. May 20, 1991).

Petitioner has not established that a vehicle is a reasonable necessity that would improve his daily functional capacity. Rather, the vehicle constitutes a lifestyle enhancement which is not compensable under § 15(a)(1)(A). Therefore, and as the life care planners ultimately agreed, a car would be a routine expense for petitioner and is therefore not compensable.

As to the cost of the scooter lift, Ms. Kattman provides for the purchase of a lift now and every seven years through life expectancy at a cost of $2,800 each time. Pet. Ex. 192 at 10. Ms. Curtis counters with the purchase of a lift now and every ten years through life expectancy at a cost of $1,384 per replacement. Resp. Ex. X at 15.

The difference in the price of the scooter lift depends upon where the lift is purchased. Ms. Curtis explained that Spinlife, through whom she priced the lift, provides "discounted" prices that are "fairly consistent," while Ms. Kattman provided actual pricing that would not fluctuate. Petitioner is awarded the retail price of $2,800 as provided by Ms. Kattman. Neither of the life care planners provided a reason for their respective positions for replacement of the lift every seven versus 10 years. It is anticipated that if petitioner was to purchase a vehicle, he would do so every seven years, which would require the replacement of the lift as well. Therefore, petitioner is awarded replacement of the scooter lift every seven years. The purchase of a vehicle is a routine cost and not medically required in this case and is denied.

### 3. Home Modifications

Petitioner's life care plan includes $121,812 for future home modifications. Pet. Ex. 192 at 14.

Respondent's plan provides $0 for home modifications because petitioner does not own a home. Resp. Ex. X at 20.

### a. The Positions of the Life Care Planners

Ms. Kattman provided for the cost of home renovations, stating that the cost is necessary because petitioner told her about his plans to buy a home upon resolution of this case, and that he "worked his life as a manager[,][7] . . . had plans for his future that he wanted to . . . achieve," and that "he wanted the equipments and accommodations to live as independently as possible, but still

---

[7] Petitioner was not a manager. He was in sales and had long stretches of time during which he was unemployed. *See* Ruling on Entitlement, ECF No. 169 at 4, 10 n.52, 23.

understood he would need assistance for basic and other activities during the day." Tr. at 139, 164. Ms. Kattman agreed that petitioner does not own a home and that it would be impossible to predict what modifications would be needed if he was to find a home to purchase. Tr. at 164, 181. However, any home petitioner would purchase would require modifications for access to the bathroom, kitchen, and making stairs safe.

Because the house type is yet unknown, Ms. Kattman used standard methodology of life care planning, "utilizing the budget that the VA puts out for people who need modifications to their home for accessibility," which in 2024 was $117,000. Tr. at 138, 139-140, 191; Pet. Ex. 155 at 4-5; Pet. Ex. 157; Pet. Ex. 162; Pet. Ex. 202. The disputed amount in the recently filed position papers include an amount of $121,812. Pet. Ex. 192 at 14. Ms. Kattman agrees petitioner is not a disabled veteran or servicemember and would not qualify for a VA grant. But one criterion for the grant is loss of a limb wherein the person cannot balance without braces, crutches, or a wheelchair. Ms. Kattman analogizes this provision to the impact petitioner's injury has had on him. She agrees petitioner is not, in fact, paralyzed and that he walks with two canes. Tr. at 140-141, 191. She also relies on an article in the Journal of Life Care Planning but agrees the article did not discuss the Vaccine Program. Tr. at 183. Ms. Kattman further agrees that she used the maximum amount of the VA award, that only 120 veterans per year receive the award/grant and that the veteran or a family member must own a home in order to receive the award/grant. Once the award/grant is awarded, an architect assesses the home to determine what is necessary for the particular home. Ms. Kattman stated the system was "imperfect" but the best one to use for petitioner without being able to get an exact quote. The number was representative. Tr. at 141-142, 144-146, 191.

Ms. Kattman stated when preparing a plan for a child, she includes a budget for the parent's home as well as the child's eventual emancipation. Tr. at 143. She agrees the Vaccine Program only provides for reasonably projected future expenses, but as a life care planner, "it's imperative to have an accurate and supportable plan, that it be developed with the same methodology, whether it's for a Vaccine Program or not." Tr. at 183-184. Ms. Kattman could not answer how many Program cases have ever approved an inherently speculative cost for modifications to an equally speculative home. Tr. at 143.

Ms. Kattman stated that petitioner currently lives in a home that is not wheelchair accessible, in an upstairs bedroom with a bathroom down the hall. Tr. at 90-91. The rental home petitioner previously lived in for years was on one level with a bathroom in his bedroom. Tr. at 91.

Ms. Curtis agreed that petitioner's current living arrangement is difficult to navigate, poses a fall risk with a dog running around and moving would be better for him. Tr. at 244-255. She also agrees that a certain degree of intervention in a future residence will be necessary to make it safer and more accessible. Tr. at 263. But petitioner's future living situation is speculative. Further, he ambulates with two canes, does not require a motorized wheelchair, and his home would not require extensive modifications, such as widening of doors. Tr. at 263. The $117,000 amount for home modifications is not specific to petitioner. Nor can a lump sum be recommended when it is unknown where petitioner is going to live. Tr. at 164. Life care plans must be based on current information, not speculation. Tr. at 293. Further, with all the adaptive and assistive devices being provided to petitioner in the life care plan, he could make his home safe. Tr. at 181-182. Ms. Kattman agreed. Tr. at 182-183.

20

**b. Petitioner's Testimony and Declaration**

Petitioner stated that with the appropriate funds from this case, he will purchase a home. Tr. at 50. He has no specific home in mind, and the choice will depend upon his financial situation. Tr. at 61. He has looked at homes in the Clovaset area near Fresno which are less costly than Sacramento; his daughter lives near there and he would like to get to know her. Tr. at 79-80. Petitioner added that, with owning a home, "I understand the things that come with that, water, gardening, all those things. I understand that, keeping it up . . . when something breaks, having someone come in and fix it. I understand that, but it's my home. It's not the landlord's home. Tr. at 50.

**c. Conclusion**

Section 15(a)(1)(A) authorizes compensation for expenses "for diagnosis, medical or other remedial care" of the injured person when those expenses are reasonably necessary because of the vaccine injury. Section 15(c) further specifies that residential compensation "shall be sufficient to enable the compensated person to remain living at home." The Program does not provide reimbursement for routine living expenses or speculative future improvements. *See Potter v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 701, 704-05 (1991) (finding that, in the context of awarding petitioner a fund for future inflation costs, the statute "mandates factual certainty" that expenses "'have been or will be necessary'" for the enumerated list of expenses, and that "[t]here is little room, therefore, for compensation based on uncertain future expenses").

In *Kono v. Sec'y of Health & Hum. Servs.*, petitioners sought compensation for increased rental costs to move from their existing apartment into a larger four-bedroom unit that they believed would better accommodate their child's medical condition. No. 93-123V, 1995 WL 774598, at *16 (Fed. Cl. Spec. Mstr. Dec. 21, 1995). While acknowledging that the family's current apartment was "not optimal for the care of a child in [petitioner's] condition," the special master emphasized that § 15(c) authorizes compensation only for expenses "'sufficient to enable the compensated person to remain living at home.'" *Id.* Because the request related to an alternate residence and lacked evidence of medical necessity or ownership, the court found no precedent to support payment of housing costs for an alternate residence, even where "the record also demonstrates that home modifications would not be possible in this situation." *Id.*

However, in *Stotts v. Sec'y of Health & Hum. Servs.*, the court upheld a special master's decision to award a lump sum for home modifications, noting that the timing of future moves could not be precisely predicted. 23 Cl. Ct. 352, 369-70 (1991). In *Mihal*, petitioner was awarded only $2,000 for home modifications when the injured party suffered from a residual seizure disorder because petitioner did not own her home. *Mihal v. Sec'y of Dep't of Health & Hum. Servs.,* No. 90-724V, 1992 WL 110339, at *2 (Cl. Ct. Apr. 30, 1992). *See also see also* H.R.Rep. No. 908, 99th Cong., 2d Sess. 1, 21, *reprinted in* U.S. Code Cong. and Ad.News 6287, 6344, 6362. ("This provision is not intended ... to provide for the payment of family living expenses, *the purchase of a home*, or the construction of a major addition. The Committee intends that this provision allow for ... such modifications to *existing physical facilities* (such as bathroom facilities) as are necessary to ensure that injured persons are not required to be institutionalized for purely economic

reasons.") (emphasis added). Thus, § 15(c) limits compensation to modification of an existing residence, but not for home modification for speculative or hypothetical future housing.

Petitioner previously lived in a rental property for many years which upon assessment by IHSS accommodated his needs. He currently lives with his friend and caregiver, Anna Jesse. Petitioner provided no evidence that he has ever owned a home. But for relying on a recovery from his vaccine related claim, petitioner has no other financial means to purchase a home. *See* Tr. at 50. Petitioner stated that he was looking for homes around the Clovaset area which is cheaper than Sacramento but provided no information about the feasibility of finding and acquiring a home there. He did not provide any information about purchasing a home in the Sacramento area where he has lived for years, has friends and a support system, and his medical providers are located.

I am unpersuaded by petitioner's argument for $121,000 for home modification. Because it is a wholly speculative cost, I deny this request.

### 4. Handyman, Yard, and Cleaning Services

Petitioner's life care plan includes $1,650 per year for handyman services, $2,100 per year for yard work, and $2,080 per year for household cleaning services from now through life expectancy. Pet. Ex. 192 at 14.

Respondent disagrees and argues these are all routine costs. Resp. Ex. X at 20.

### a. The Positions of the Life Care Planners

Ms. Kattman included these items because petitioner "would like to have [these things] for his future based on what his goals had been prior to the vaccine injury" and because these were things petitioner used to do when he lived in his prior rental property but can no longer do because of his vaccine-related injury. Tr. at 147-148, 184. If his future residence is a single-family residence with a yard, petitioner will need this assistance. Tr. at 184.

After much posturing, Ms. Kattman agreed that when she prepares a plan, she includes all the needs of a disabled person but recognizes the law will dictate whether or not all will be provided. Tr. at 184-187. She stated that the Vaccine Act language is "nuanced" and in some cases yard care assistance has been provided even when characterized as a routine expense. Tr. at 188.

Ms. Kattman agreed that it is hard to predict that petitioner will need handyman services whether in a rental property or home of his own for the things that people do routinely like hanging decorations and changing filters. Tr. at 188-189. She estimated 25 hours per year based on the "time use survey." If the gutters need to be cleaned or the house needs more fixing, the cost could increase, but she provided for about two hours per month for changing water filters, light bulbs, replacing screens, etc. Tr. at 189. She agrees if petitioner lives in an apartment, he may not have a need for any of these services. Tr. at 189. She also provided for heavy cleaning, including washing walls, windows, ovens, and vents, things a caregiver would not do but petitioner previously did. Tr. at 190.

Ms. Curtis stated these costs, like home modifications, are speculative and not specific to petitioner because it is unknown where he will be living. Tr. at 265-266, 298-299. She does provide these services on occasion for the elderly when they own their own home and provide documentation that they had to hire someone to do the things they had previously done. Tr. at 299. This kind of provision is specific to the individual and to their living situation. Petitioner's future living situation is unknown. Tr. at 300.

### b.  Conclusion

In *Whitledge v. Sec'y of Health & Hum. Servs.*, the Court denied reimbursement for "mortgage payments, lawn care, snow removal and food" and entertainment expenses holding that such costs were "not the result of and [were] not related to [the child's] injuries" under § 15(a). 19 Cl. Ct. 144, 144-45 (1989). Similarly, in *Spayde v. Sec'y of Health & Hum. Servs.,* tasks like cooking and home maintenance are compensable only when "reasonably necessary" to assist the injured person, not as ordinary domestic chores. No. 16-1499V, 2023 WL 6806125, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2023).

Petitioner seeks routine expenses for a handyman, housekeeping, and landscaping services for a home that he does not own and for a residence that may or may not require such services. For example, if petitioner finds a suitable apartment, many of these services may be provided while others are routine living expenses with some already being provided for by a caregiver. The Program does not provide compensation for ordinary lifestyle or convenience costs. Thus, compensation associated with a home petitioner does not own and for services he may not need is speculative and inappropriate.

Petitioner's request for compensation for handyman, yard, and cleaning services is denied.

### 5.  Disposal Bags

Ms. Kattman's life care plan includes $15 per year for garbage bags, one per day. Pet. Ex. 192 at 7. Ms. Curtis disagrees, arguing that garbage bags are a routine cost of daily living. Resp. Ex. X at 11.

### a.  The Positions of the Life Care Planners

The life care planners agree and provide for incontinence products including briefs, wipes, bed pads, and gloves. Tr. at 100-101. Ms. Kattman included trash bags for incontinence products to be disposed of daily. Tr. at 101.

Ms. Curtis disagreed for two reasons. First, garbage bags are a routine expense. Second, petitioner reported incontinence resulting from his IVIG treatment. This issue is not noted in his medical records. But assuming petitioner does experience frequent incontinence, medications are available to address the issue. Tr. at 272, 304-305. Ms. Curtis also included a bedside commode for more independence. Tr. at 304.

### b.  Conclusion

Garbage bags are a routine cost of daily living and would be required regardless of whether an injury exists. They are therefore not compensable.

### 6.  Case Management Services

The parties agree on case management services but disagree on how many hours are necessary. ECF No. 206 at 4.

Ms. Kattman provides for three hours per month of case management for the first three years at a rate of $5,220 per year and two hours per month for each year thereafter to life expectancy for $3,480 per year. Pet. Ex. 192 at 9. Respondent provides for two hours per month to life expectancy in the amount of $3,480 per year. Resp. Ex. X at 13.

Ms. Kattman and Ms. Curtis agree to a rate of $145 an hour. Tr. at 112.

### a.  The Positions of the Life Care Planners

Ms. Kattman stated that she added an extra 12 hours in the first three years to ensure petitioner has advocacy and support while he changes from IHSS to a home health agency, purchases a home, has modifications performed to ensure accessibility, transitions from Medicaid to Medicare with the appropriate supplements, purchases a vehicle and insurance, confirms coverage of his IVIG treatment, and all else that needs to be done for a smooth transition. Tr. at 112-116. She provides for additional hours for three years because these things take time especially finding and remodeling a house. Tr. at 115-116.

Ms. Curtis argued that petitioner's care is consistent with established medical providers. The case manager she provided will assist with his transition to a local neurologist and with getting him scheduled for therapies. Tr. at 269. Further, the home health agency providing the caregiver will assign a case manager to oversee the hours needed and will provide all scheduling for petitioner's needs. Tr. at 269-270. Petitioner is well-versed in his condition, lives in a familiar area, and getting him into therapies and potentially a local neurologist would not take much coordination. Tr. at 275-276. Petitioner is already on Medicare. Tr. at 277. Therefore, two hours per month is sufficient for his needs. Tr. at 270.

### b.  Conclusion

I spent five days at hearing with petitioner over the years. He is intelligent, articulate, and knowledgeable about his health and medical conditions with no mental or communication deficits. He is quite capable of handling his daily affairs. His medical records confirm his ability to attend to his daily activities and refer to him as a good historian well-versed in his various medical conditions. Ms. Kattman's recommendations are based on what petitioner wishes his life to look like and what she was told by caregivers he has hired. This includes Ms. Jesse, who has been petitioner's friend for years, with whom he currently lives, is being paid by IHSS to provide the services deemed necessary to him, has been promised additional monies from the Vaccine Court,

and based on the foregoing, would support all that petitioner claims that he needs and wants.

Ms. Kattman has provided case management services for every possible scenario that could arise, many speculative, others covered by the caregiver during the hours provided and none requiring three years to accomplish. Ms. Kattman agrees that two hours per month every year for life after the first three years is appropriate. Many of the reasons provided by Ms. Kattman for the extra 12 hours are for events that do not exist. These include, for example, transition from Medicaid to Medicare (petitioner already has Medicare Parts, A, B and D in place), buying a car and insurance, and buying a house and doing modifications. Many of these scenarios are, at this point, entirely speculative.

Petitioner is awarded case management services in the amount of two hours per month for life.

### 7. Grab Bars

Petitioner seeks the installation of four grab bars with replacement every 10 years through life expectancy at a cost of $252 now and for each replacement. Pet. Ex. 191 at 11. Respondent includes portable grab bars for petitioner's rental home that he can take with him in the future at a cost of $36.99. Resp. Ex. X at 17.

#### a. The Positions of the Life Care Planners

Ms. Kattman provided for a range of grab bars with installation in different locations, in the bathroom, one in the shower, one by the toilet, for a total of $252. Tr. at 128. She recommends they be installed to be secure. The ones Ms. Curtis proposes attach by suction cups which is concerning in light of petitioner's weight and the bars' tendency to come unstuck. The portable bars pose a fall risk. Tr. at 129-130.

Ms. Curtis recommends portable grab bars because petitioner is in a rental situation and/or not a permanent residence. Petitioner may not be able to permanently alter his current residence. Tr. at 272, 294. His future living arrangement is unknown. Tr. at 294.

#### b. Conclusion

I agree with Ms. Kattman that portable grab bars attached to the wall by suction cups are not always secure. However, for well over 13 years, petitioner has been navigating the bathroom and showering without grab bars. Ms. Curtis is also accurate that permanent grab bars cannot be installed in a rental property or a temporary residence belonging to a friend. Petitioner walks with two canes, is stronger with IVIG, and has been advised by his neurologist and both life care planners of the necessity for physical and occupational therapy to increase strength and balance and to be educated on transfers.

The permanent grab bars as proposed by petitioner are the best option considering the relative safety and efficacy of the options. However, petitioner does not currently live in his own residence and so cannot permanently modify the home in which he lives. As a result of petitioner's

current living conditions, the portable grab bars are the best option and should be provided for at this time. However, permanent grab bars will be necessary if and when he moves to a suitable home. Petitioner shall be provided with two portable grab bars, one to be located by the toilet and one to be located in the shower for now. A set of permanent grab bars, one to be installed by the toilet and one to be installed in the shower, are also to be provided for when petitioner moves to a more suitable permanent location with replacements every 10 years for life.

### 8.  Adjustable Bed Frame and Mattress

The parties disagree that petitioner is entitled to an adjustable bed frame and mattress. ECF No. 296 at 4.

Petitioner's life care plan includes $1,083 for a bed frame now and every 13 years thereafter for life expectancy and $1,260 for a mattress now and every seven years through life expectancy. Pet. Ex. 192 at 13.

Respondent argues that this is a routine expense and not medically necessary. And even if it was medically necessary, it would be covered by Medicare. Resp. Ex. X at 19.

### a.  The Positions of the Life Care Planners

Ms. Kattman stated that an adjustable bed is necessary to assist petitioner with bed mobility, alleviate some of his symptoms, and help him and the caregiver get him in and out of bed. Tr. at 132. It would also help with his comfort due to tingling and numbness and weakness in his extremities. Tr. at 132. Ms. Kattman provided a range of costs for various adjustable beds, some with moveable headboards and some that move up and down or raise and lower the feet. Tr. at 132. She stated that a hospital bed typically provided by Medicare is small and adults usually sleep in a queen- or full-size bed. Hospital beds also have sharp edges and are not very comfortable, particularly for a bigger person like petitioner. Tr. at 133-136. She provided for mattress replacement every seven years due to incontinence. Tr. at 136. Ms. Kattman did not think petitioner would qualify for an air mattress, which would be covered by Medicare and is adjustable, because he is not paralyzed. Tr. at 133-134.

Ms. Kattman acknowledged that there is no prescription or doctor's letter recommending such a bed, but concluded it was necessary after visiting petitioner at his home and understanding his needs. Tr. at 196. She agreed that if an adjustable bed were medically necessary, Medicare would cover it. Tr. at 196. According to Ms. Kattman, not everything in a life care plan needs to be medically necessary, it only needs to be reasonable to help the individual to get to the point they were prior to their injury. An adjustable bed is necessary for petitioner to be able to get in and out of bed more easily during the night and to help with symptom management. Tr. at 136.

Ms. Curtis stated that if petitioner had a medical need for a bed, Medicare with Medigap would pay for it. With no showing of medical necessity in this case, this would be a routine expense. Tr. at 268.

26

### b.  Conclusion

In general, a bed is a routine expense. Here, there is no medical indication that petitioner is in need of a special bed. Further, according to petitioner, his incontinence issues are related to his IVIG treatment which Ms. Curtis stated could be controlled with medication and with a portable urinal at bedside. Further, physical therapy to gain strength and balance as well as educating petitioner on safe transfers is being provided and will aid petitioner's ability to get in and out of bed and walk to the bathroom. Providing for petitioner's medical needs and independence is the goal. There is no medical support for a specialized bed and mattress in this case. This request is denied.

### 9.  Travel-Related Expenses for Future Neurology Visits

Dr. Shaoulian is located in Culver City. Petitioner's life care plan includes $4,336 per year now through life expectancy for petitioner and an attendant to fly in "comfort plus or business class," $17.64 per year now and through life expectancy for mileage, $1,876 per year now and through life expectancy for hotel rooms for petitioner and his attendant, $516 per year now and through life expectancy for meals and incidentals for petitioner and his attendant, and $96 per year now through life expectancy for ground transportation for petitioner and his attendant. Pet. Ex. 192 at 16-17.

Respondent provides $333.48 to cover mileage to Culver City for two more visits and $938 for a hotel for those two visits before transitioning to a local neurologist for care. Resp. Ex. X at 22.

### a.  The Positions of the Life Care Planners

Ms. Kattman argues that petitioner has a right to choose and direct his own medical care and he chooses to treat with Dr. Shaoulian, a CIDP expert, in Culver City. Tr. at 148, 204. Petitioner advised Ms. Kattman that Dr. Shaoulian has made a marked difference in his health. Tr. at 204. Dr. Shaoulian must see petitioner twice per year to prescribe IVIG treatments. Since driving is too difficult, Ms. Kattman provided for flights, hotel, and "incidental food" for petitioner and his caregiver. Tr. at 148-150. Ms. Kattman stated it is not uncommon for people with severe and rare conditions to seek out experts and to follow up with them. Tr. at 150. She added that traveling to Dr. Shaoulian "is for medical-related needs, which are not routine. They're related to the vaccine injury." Tr. at 151. She included food because it is more expensive when traveling, while acknowledging that it is a routine cost for travel. Tr. at 151-152. Further, petitioner needs his caregiver with him for additional assistance when traveling to unfamiliar places. Tr. at 193.

Ms. Kattman agrees that there are local neurologists, but petitioner should be able to make his own decisions about his healthcare. It is not "up to us to change the plan. It's up to us to understand his needs and what the costs associated with those are." Tr. at 193-195, 204. She discussed an article that speaks of patient autonomy and the fundamental right of the patient to participate in healthcare decisions. This encapsulates how she feels about petitioner's right to choose his own physicians. Tr. at 317. Her research into CIDP specialists at UC Davis revealed that petitioner would require a referral and evaluation by the neurology board to see if he would

be accepted as a patient. Tr. at 313-314. Ms. Kattman acknowledged that petitioner was previously treated at UC Davis by two different doctors. Both doctors denied restarting IVIG treatment because they found petitioner's sensory motor neuropathy unclear and that his diabetes was contributing to his disabilities. Further, no other doctors in Sacramento would restart IVIG treatment. Tr. at 314-315. Ms. Kattman acknowledged that petitioner goes to Dr. Shaoulian because he is willing to prescribe IVIG, but the treatment makes a big difference for petitioner. Tr. at 315.

Ms. Kattman acknowledged that Ms. Curtis provided for two additional trips to Dr. Shaoulian with a transition to a local physician. She stated she would have to speak with Dr. Shaoulian to see if he would be willing to consult with a local specialist in CIDP if petitioner was no longer seeing him. She doubted that he would because he is part of a different hospital system. Tr. at 195-196.

Ms. Curtis recommended that petitioner see a local neurologist. Travelling to see a doctor twice yearly for his condition is not medically indicated. He lives in Sacramento, not a rural area, and is near UC Davis, a nationally known medical research facility with a number of doctors who treat CIDP. Tr. at 266. Recognizing that petitioner has a relationship with Dr. Shaoulian, and that petitioner has the right to choose his own doctors, Ms. Curtis provided for two more visits to Dr. Shaoulian which would be enough time for him to transition to a local doctor. Ms. Curtis stated that doctors consult with one another all the time. Tr. at 266, 320. Ms. Curtis recommends that petitioner find a provider closer to home because, as he gets older, traveling will become more difficult. Tr. at 319. Ms. Curtis agreed that petitioner treated with several local neurologists who had not gotten him to the level of function he is at with Dr. Shaoulian. Tr. at 320. However, with a competent case manager, which has been provided for in the life care plan, a local neurologist willing to communicate with Dr. Shaoulian can be found. Tr. at 267. A transition to a local doctor now before petitioner gets older with more difficulties attendant to travelling was recommended. Tr. at 267.

Ms. Curtis provided for two final visits to Culver City by car, which is more cost effective. She added that petitioner sat through two days of hearing without a problem, so traveling by car should not pose a problem either. Tr. at 267. Food and lodging would be routine expenses and are not included. Tr. at 268.

### b. Petitioner's Testimony and Declaration

Petitioner stated that he had bad results with a neurologist at UC Davis and that UC Davis told him there were no specialists in CIDP at their facility. Tr. at 46. Petitioner later equivocated about whether he saw a neurologist at UC Davis. Tr. at 70-71.

Petitioner stated that he contacted the GBS/CIDP Foundation, explained his situation, was told that a lot of people do not understand CIDP, and was provided with a website to review. Tr. at 43. After he watched a video on the website, petitioner's friend called and made an appointment for him to see Dr. Shaoulian in Culver City. Tr. at 43. He presented to Dr. Shaoulian, who explained his specialty, gathered all the medical records, and set a follow-up appointment. Tr. at 44. Dr. Shaoulian told petitioner that this would be a journey and that there was no cure for his

28

disease. Petitioner had an EMG, and they discussed CIDP, the need for follow-up, and petitioner's problems with finding a neurologist locally. Tr. at 45. Dr. Shaoulian understands him. Tr. at 46. He has been seeing Dr. Shaoulian since 2021. Tr. at 47. He receives IVIG twice weekly and must present twice yearly for examination with Dr. Shaoulian so that the IVIG orders continue. Tr. at 69; Pet. Ex. 111 at 5-6. The flight is half an hour, and the hotel van picks petitioner and his companion up at the airport. The hotel has restaurants and Dr. Shaoulian's office is nearby. Driving takes between seven and eight hours because petitioner needs to stop frequently and his legs hurt after the trip. Tr. at 44, 47.

### c. Medical Records

Petitioner's IVIG was discontinued in 2017 by his treating neurologist who suspected his ongoing symptoms were indicative of something other than CIDP. Pet. Ex. 99 at 10. A second opinion agreed. Pet. Ex. 89 at 302, 72, 79-80. Petitioner then presented to numerous specialists seeking IVIG treatments, but no one would prescribe it. Pet. Ex. 65 at 13, 25, 26, 33-34; Pet. Ex. 107 at 9-10, 11, 18, 20; Pet. Ex. 112 at 142-43, 154, 166, 170. Petitioner presented to Dr. Shaoulian in Culver City in September of 2021. Dr. Shaoulian was willing to restart IVIG. Pet. Ex. 124; Pet. Ex. 119; Pet. Ex. 120. Dr. Shaoulian's records document that, with IVIG treatments, petitioner walks better, uses two canes, no longer uses a wheelchair, and has significant improvement in upper and lower body strength and pain vibration sense on examination. Petitioner's legs become heavy when the IVIG wears off. Pet. Ex. 144 at 6; Pet. Ex. 136 at 1. He has 5/5 strength in all extremities with normal sensory to vibration, decreased pin sensation to the knees, and zero reflexes throughout on examination. He has normal rapid alternating movements and could stand pushing on his cane but drags his legs. Dr. Shaoulian continues IVIG as long as petitioner presents twice a year for examination. Pet. Ex. 143; Pet. Ex. 181.

### d. Conclusion

The goal of the Vaccine Program is to compensate a petitioner for his medical needs relating to his vaccine injury. Often, people do not get to choose their physician because the one they want may not accept their insurance or may be out of network and costly. The option to pay out of pocket is an individual choice. Petitioner's medical records are clear about the following: between 2017 and September 2021, no local doctor would order IVIG, believing that petitioner's disabilities were not related to his CIDP and that IVIG was unnecessary. Petitioner found Dr. Shaoulian who was willing to order IVIG treatments. The medical records confirm that petitioner has significant improvement with IVIG, is able to walk with two canes, can get up from a chair, and has 5/5 strength in his legs and arms.

Petitioner certainly has a right to choose his own doctors and direct his own medical care but the additional costs associated with that choice are his to bear, especially when they include business class airfare, hotels, food, and ground transportation costs. Food and incidentals are necessities of daily living and are costs that would be incurred regardless of where a medical visit takes place. As petitioner noted, the flight to Culver City is about a half hour. If petitioner believes flights and hotel stays are necessary, then he should bear that cost. It is petitioner's choice to treat with a doctor that he believes requires air travel twice a year rather than locally in the Sacramento area, which boasts UC Davis Medical ranked first by World and News Reports as well as the

29

Kaiser Permanente health care system. Dr. Shaoulian is a neuromuscular specialist. With all due respect to the doctor, caring for those with polyneuropathies, including but not limited to diabetic neuropathies, GBS, and CIDP, is not a rarity and neither are doctors who specialize in treating polyneuropathies.

Petitioner is awarded only the cost of travel to Culver City by car two times a year for his examination with Dr. Shaoulian now and for life. No other costs will be provided.

## C. Disputed Out-of-Pocket Expenses

A Vaccine Program claimant may recover past actual unreimbursed expenses which

(i) resulted from the vaccine-related injury for which the petitioner seeks compensation,
(ii) were incurred by or on behalf of the person who suffered such injury, and
(iii) were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(B). The petitioner bears the burden of showing that their requested costs are reasonably necessary. *See, e.g., Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-92V, 1996 WL 147722, at *13 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

The parties were ordered to submit final disputed expenses and did so on December 1, 2025. Resp. Ex. DD. The Joint Submission contains the parties' positions on past unreimbursable expenses as follows: invoices for in home care for Ms. Jesse, Ms. Jones, and Ms. Marmolejo, moving expenses to Georgia, certain medical visits, various prescriptions, and lawn care totaling $78,498.64. *Id*. at 1, 5-6. Additional mileage of $2,851.27 was submitted by petitioner and $2,810.47 was recommended by respondent. *Id*. at 7-23. An amount of $5,252.23 was included as agreed upon for items designated in the attached chart. *Id*. at 2-4.

### 1. Caregivers

Petitioner seeks reimbursement for hours Ms. Jesse has provided care in excess of those provided and paid for by IHSS and for care provided in 2013-2014 prior to petitioner applying for IHSS for a total to date of $26,413.76 to be updated at the time of this Ruling. Petitioner also requests reimbursement for 24-hour care provided by Amanda Jones in the amount of $24,030 and Mariana Marmolejo in the amount of $24,750 while petitioner was in Georgia between October 2023 through March of 2024. The total caregiver costs requested is $75,193.74. ECF No. 296 at 7, ECF No. 296 at 7 n.2.

These amounts are reflected in a chart contained in the Joint Submission:

30

| Exhibit | Caregiver | Date Range | Amount of Invoice |
|---|---|---|---|
| Pet. Ex. 201 | Anna Jesse | 08/02/25 – 11/14/25 | $2,906.60 |
| Pet. Ex. 196 | Anna Jesse | 07/28/25 – 08/01/25 | $1,434.42 |
| Pet. Ex. 193 | Anna Jesse | 04/19/25 – 06/27/25 | $2,458.54 |
| Pet. Ex. 190 | Anna Jesse | 01/24/25 – 04/18/25 | $2,781.15 |
| Pet. Ex. 189 | Anna Jesse | 03/23/24 – 01/23/25 | $10,060.55[8] |
| Pet. Ex. 176, 180 | Anna Jesse | 11/01/13 – 09/15/14 | $6,772.50 |
| Pet. Ex. 173, 181 | Amanda Jones | 10/2023 – 04/2024 | $24,030.00 |
| Pet. Ex. 172, 182 | Mariana Marmolejo | 10/2023 – 04/2024 | $24,750.00 |
|  |  | TOTAL: | $75,193.76 |

Petitioner relies on evidence filed as Pet. Ex. 138, 141, 180-183 in support of these out-of-pocket expenses.

Respondent objects to reimbursement of these out-of-pocket expenses for the reasons set forth in his filings on October 7, 2024, October 21, 2024, and January 2, 2025, as well as in respondent's brief. ECF Nos. 254, 256, 263.

### a. Petitioner's Declarations

Ms. Jesse was petitioner's housemate on August 19, 2013, when he received the subject flu vaccination. Pet. Ex. 183 at 2. According to petitioner, in November of that year, Ms. Jesse "took on the tasks of providing [him] the care [he] needed. This was before [he] knew about and later applied for IHSS benefits." *Id.* Petitioner promised to pay Ms. Jesse $645 per month to take care of him. *Id.*; Pet. Ex. 180. From September 2014 until March 22, 2024, except for the time Mr. Merrill lived with petitioner and when petitioner was in Georgia, Ms. Jesse "agreed to be paid by IHSS." Pet. Ex. 183 at 2. From December 2019 through November 2022, petitioner's friend, Scott Merrill, lived with petitioner and provided petitioner with 24-hour care until Scott passed away. *Id.*

In October 2023, petitioner moved to Georgia due to an 8.3% rent increase which he could not afford and the fear of becoming homeless. Pet. Ex. 183 at 2; Pet. Ex. 138 at 2. The Ebenezer Baptist Church in Georgia put him in touch with caregivers Ms. Jones and Ms. Marmolejo who came to California, helped him pack, and found a place for him to live in Georgia. Pet. Ex. 138 at 3. Once in Georgia, Ms. Jones and Ms. Marmolejo provided "around the clock care" to him. Pet. Ex. 183 at 2; Pet. Ex. 181; Pet. Ex. 182. Ms. Jones provided care from 4:00 or 4:30 pm to 4:30 am and Ms. Marmolejo from 7:00 am until 4:00 pm, seven days per week. Petitioner was only left alone for a short time and generally when asleep. Pet. Ex. 138 at 3. According to petitioner, he is a fall risk in need of assistance with transfers, cooking, water temperature, and lifting. While in Georgia, he was weak and lost a lot of strength and weight with "bad" balance and dexterity. Pet. Ex. 138 at 5. Petitioner had no agreement with Ms. Jones or Ms. Marmolejo other than he would submit the costs associated with his care to the Vaccine Program for reimbursement. The amounts submitted for each caretaker are contained in Pet. Ex. 171; Pet. Ex. 172; Pet. Ex. 173; Pet. Ex. 183

---

[8] This total represents the combined sums of Ms. Jesse's time billed for March 23, 2024, to January 23, 2025, and her time for a trip she took to accompany petitioner to Dr. Shaoulian. *See* Pet. Ex. 189 at 5.

31

at 2; and Pet. Ex. 138 at 3.

Petitioner declared that "IHSS did not pay for the amount of care I required; but it certainly helped. . . . I was responsible for the cost of care above and beyond that which they would pay." Pet. Ex. 183 at 3; Pet. Ex. 174 at 346; Pet. Ex. 179 at 2-3.

### b.  Declarations of Anna Jesse and Supporting Documents

Ms. Jesse submitted a Declaration on February 20, 2025, with claimed hours owed for services she provided to petitioner for 2013 to 2014, 2014 through November 2019, 2022 to 2023, and from March 2024 onward. Pet. Ex. 189 at 2. According to Ms. Jesse, in 2013, she agreed to a "flat fee" of $645 a month "which reflected my half of the rent where we lived." *Id*. She submitted an invoice for 13 months between 2013 and 2014 for $645 per month for a total of $8,385. *Id*. at 2; Pet. Ex. 159 at 94-95. An overlap in charges between Ms. Jesse's billing and payments made by IHSS were noted during the hearing. Ms. Jesse then submitted an amended invoice that removed September, October, and November of 2014 resulting in a reduced total of $6,772.50 for 2013 to 2014.

Ms. Jesse declared that she agreed to accept what IHSS paid thereafter through November 2019, and again between 2022 and October 2023 when petitioner moved to Georgia. Pet. Ex. 189 at 2. Therefore, there are no invoices for those time frames.[9]

Ms. Jesse declared that in March of 2024, when petitioner returned from Georgia, she realized that she provided more hours of care to petitioner than IHSS was paying. Petitioner agreed to pay her the difference between what IHSS paid and the actual time she cared for petitioner at a rate of $17 per hour, the pay rate of IHSS. The pay rate then increased to $18.15 an hour. Pet. Ex. 189 at 2. Ms. Jesse's invoice for March 23, 2024, through January 23, 2025, is $9,570.50 plus $490.05 for a trip to Culver City in April 2024. Pet. Ex. 189 at 5. The total for the foregoing is $16,883.05. Pet. Ex. 189 at 5. The final Joint Submission filed in December 2025 includes updated invoices for a total of $26,413.74.

Ms. Jesse declared she only had petitioner's word that he would reimburse her the excess hours by submitting her invoices to the Vaccine Program. But she would not have provided the excess care without his word that she would be paid by the Program because petitioner's care is time consuming and she is available to him around the clock. Pet. Ex. 189 at 2-3.

While not a licensed or certified caregiver, Ms. Jesse is authorized by IHSS to assist petitioner based on IHSS criteria for friends or relatives to act as caretakers to ensure individuals can remain in their homes safely, comfortably, and with as much independence as possible. Pet. Ex. 189 at 3-4 (citation omitted). A background check, drug test, assessment, paperwork, and a mandatory care video was required. *Id*. at 4. According to Ms. Jesse, she did not charge overtime or mileage. She added that other care providers are paid more than she is, noting that the minimum wage in California is $20 per hour at McDonald's, $16 per hour for unlicensed caregivers, and $24 per hour for overtime over 12 hours. *Id*. She has taken care of petitioner for a combined total of

---

[9] Mr. Merrill accepted what IHSS paid during the time he lived with petitioner, and thus there are no invoices here associated with the care Mr. Merrill provided.

seven years. *Id*.

She added that IHSS makes it clear that any hours of care in excess of what it provides is the recipient's financial responsibility. Pet. Ex. 189 at 4; Pet. Ex. 174 at 346; Pet. Ex. 179 at 2.

Various submissions prepared by Ms. Jesse were filed, some to correct mathematical mistakes made, all "personally drafted" during the damages phase of this case. Pet. Ex. 189 at 3; Pet. Ex. 169; Pet. Ex. 171 (amended to reflect mathematical errors in Pet. Ex. 169). Ms. Jesse prepared a revised chart dated February 18, 2025, to reflect her allocation of time and offsets for the difference between the amount of time she is paid by IHSS, the additional time she provides care, the hours she works as a corporate accountant, and five hours of sleep per night. This totals $16,833.05, or 387 hours of care per month, minus 175.18 hours provided by IHSS, currently 186.36 hours, minus 160 hours per month that Ms. Jesse works as an accountant, for the total additional hours she provides. Pet. Ex. 189; Pet. Ex. 187; Pet. Ex. 201; Pet. Ex. 144; Pet. Ex. 176; Pet. Ex. 180. For example, for August 2, 2025, through November 14, 2025, she calculated 387.92 hours of care a month, minus the current 186.36 hours covered by IHSS, minus 160 hours for her job for a total of 41.56 additional hours of care provided or $2,906.60. Pet. Ex. 201. Similarly, from April 19, 2025, to June 27, 2025, she included 387.91 hours per month minus 175.18 paid by IHSS, minus 160 hours for her job for a total of 52.73 additional hours of care or $2,458.54. Pet. Ex. 193. For June 28, 2025, through August 1, 2025, which included travel to "Los Angeles" to the neurologist, she included a total of 387.91 hours per month, minus 175.18 hours paid by IHSS, minus 160 hours for her job, with a balance of 52.73 additional hours, plus an additional 11 hours for travel, totaling $1,434.42. Pet. Ex. 196.

Ms. Jesse declared that she provides all the care contained in the Chart of Daily Duties IHSS has assessed as necessary for petitioner for the hours provided. In addition, Ms. Jesse makes petitioner's bed, does his vacuuming, cleans his room and bathroom, empties his garbage, makes his coffee, preps his lunch and snacks for the infusion center, irons his shirts and jeans, takes him for a haircut every two weeks, pays his bills, makes his doctor's appointments, schedules his transportation, calibrates her phone for the Dexcom once every 10 days, takes his blood pressure, and does physical therapy and strengthening and balance exercises with him in the mornings and evenings. Pet. Ex. 201; Pet. Ex. 174 at 423-428.

Ms. Jesse works in corporate accounting. Tr. at 163. She claims to be available to petitioner 24/7. There is some discrepancy as to whether she works from home; Mr. Davis testified that Ms. Jesse never works outside the home, while Ms. Kattman stated she understood from petitioner that Ms. Jesse sometimes works outside the home and, during those times, Ms. Jesse's boyfriend was available to petitioner. Tr. at 162.

### c. Declaration of Amanda Jones and Supporting Documents

Ms. Jones declared that she and Ms. Marmolejo provided 24/7 care to petitioner from October 3, 2023, to March 22, 2024. Pet Ex. 181 at 1. In return, petitioner agreed to reimburse them for their time by submitting their invoices to the Program because he did not have the funds to pay them. There was no formal agreement. *Id*. Ms. Jones declared that without this agreement she would not have provided care to petitioner. *Id*. at 1-2. "As far as I know, there was no other

33

fund in Georgia that [petitioner] was eligible for that we could apply to for reimbursement of his care." *Id*. at 2. Ms. Jones's and Ms. Marmolejo's "names and the days and hours [they] were putting in" were submitted to the Court. *Id*. at 3; Pet. Ex. 138 ¶¶ 16, 18.

Ms. Jones declared that petitioner left Georgia "fairly suddenly" around March 22, 2024. Pet. Ex. 181 at 2.

Ms. Jones did not know what private aides are paid but was informed it was up to $30 per hour. However, she and petitioner agreed that $18 per hour was reasonable since she would not be paid "in a timely manner." Pet. Ex. 181 at 2. She submitted a letter on June 5, 2024, with her hours 5:00 PM to 8:00 AM, billing rate, $18 per hour, and duties, including bathing, administering nighttime medications, cleaning, setting up appointments, assisting with bathroom needs, administering insulin, budgeting needs, shopping for groceries, nighttime monitoring, changing bed linens, and ensuring comprehensive care and comfort. The letter did not contain the number of hours Ms. Jones worked or the total amount billed for her services. *Id*. at 4. When advised that the details were insufficient, she submitted a second letter stating that, from October 3, 2023, until March 22, 2024, she worked from 5:00 PM until 8:00 AM, or 105 hours per week. This "balances out to 2,700 hours total" at $18 per hour "with a total of $48,600.00 for the time [petitioner] resided in Georgia." *Id*. at 2, 5. Petitioner declared that Ms. Jones was subsequently provided with a "new calculation . . . in chart form . . . in the amount of $23,618.06. . . . [D]espite the actual amount of time that was required and was provided, I adopted the chart for ease . . . and informed Mr. Davis that I would agree to be compensated this lesser amount."[10] *Id*. at 2; Pet. Ex. 173.

Ms. Jones declared that her training and qualifications include private elderly assistance and is unaware of any Georgia state requirements to be credentialed or licensed to provide aide to "one in need."[11] Pet. Ex. 181 at 2.

According to Ms. Jones' submissions, she worked from 5:00 PM until 8:00 AM daily for five months, seven days a week, with no time off. She listed her duties as including, but not limited to bathing, administering nighttime medications, cleaning, setting up appointments, assisting with bathroom needs, administering insulin, budgeting needs, shopping for groceries, nighttime monitoring, changing bed linens, and ensuring comprehensive care and comfort. Pet. Ex. 181 at 5.

### d. Declaration of Mariana Marmolejo and Supporting Documents

Ms. Marmolejo submitted a Declaration on November 7, 2024, which was similar to Ms. Jones' and declared that between October 3, 2024, and March 22, 2024, she provided care to petitioner while he was in Georgia. Petitioner was to submit their invoices for reimbursement through the Program for his round-the-clock care that he could not afford to pay for. Pet. Ex. 182 at 1. Ms. Marmolejo did not have a formal written agreement with petitioner, but without this understanding for payment through the Vaccine Program, she would not have provided the type

---

[10] Ms. Jones does not advise who prepared this new chart, why she was willing to accept less than half of what she originally billed, why she agreed to a lesser rate than the $18 per hour she originally agreed to, or with whom exactly she agreed to accept this lesser amount.

[11] Ms. Jones did not provide any details regarding her training or qualifications but admittedly has no credentials or licensing to provide medical and/or assistant care.

of care she provided. Georgia had no other fund for which petitioner was eligible. *Id*. at 1-2. Ms. Marmolejo's days and hours were submitted by petitioner. *Id*. at 2; Pet. Ex. 138 ¶¶ 16, 18.

Ms. Marmolejo declared that petitioner departed Georgia "fairly suddenly" on March 22, 2024.[12] Pet. Ex. 181 at 2

Ms. Marmolejo, like Ms. Jones, wrote a letter dated June 5, 2024, calculating what was owed in the amount of $29,160 with her hours, 8:00 AM to 5:00 PM, billing rate, $18 per hour, and duties, including personal care, bathing and grooming, preparing meals that cater to dietary requirements and personal needs, transportation to and from appointments and other commitments, administering insulin and managing medication schedules, conducting Hizentra infusions as prescribed,[13] picking up items from the pharmacy, washing, ironing, caring for clothing, and assisting with leg braces as needed. She was told the submission was insufficient, prompting a second letter which included 1,620 hours, or nine hours per day, at $18 per hour, or $29,160. Pet. Ex. 182 at 2, 4, 5. She too received a chart with calculations "quite a bit different" in the amount of $24,325.71 but adopted the chart "for ease" and advised petitioner she would accept the lesser amount. *Id*. at 2; Pet. Ex. 172.

Ms. Marmolejo has no "specialized training, only personal caregiving to elder family members," but is unaware of any Georgia state requirements to be credentialed or licensed to provide "private aide [sic] to one in need." Pet. Ex. 182 at 2. She does not know what private aides are paid but believes it to be as high as $30 per hour. She and petitioner agreed to $18 per hour for her services "due to the fact I was willing to wait for him to settle his financial situation." *Id*. at 2.

### e.  Conclusion

#### i.  Ms. Jesse

Petitioner claims to owe Ms. Jesse for the care she provided between November 2013 and November 2014 and for time beyond what IHSS has paid since his return from Georgia. Petitioner argues that this is an outstanding debt because, though petitioner did not have the money to pay, the statute does not require evidence of payment, only that the debt was "incurred." ECF No. 220 at 5-6. Petitioner cites *Civatte v. Sec'y of Health & Hum. Servs.*, No. 18-1750V, 165 Fed. Cl. 520 (2023) to support that, in the context of the statute and elements outlined in § (15)(a)(1), an expense is "incurred" when one paid or became liable for it. *Id*. at 6. Petitioner presented no argument regarding the two caregivers from Georgia.

Ms. Jesse was petitioner's roommate in 2013 when he received the subject vaccine. Transcript of Entitlement Hearing ("Tr. Entitle."), ECF No. 130 at 29, 41. At the time of the entitlement hearing, petitioner did not testify to any specific care needed or being provided to him by Ms. Jesse from November 2013 to 2014. Tr. Entitle. at 29. Petitioner did testify to the care he received from Mr. Merrill who was his friend and housemate until Mr. Merrill's unexpected death.

---

[12] Ms. Marmolejo's Declaration mirrors Ms. Jones'.

[13] Petitioner declared that Ms. Marmolejo was trained by CSL Beahring to administer Hizentra subcutaneous infusions. The company has a 24-hour hotline to a nurse, and the infusions take between three to four hours for two consecutive days. Pet. Ex. 138 at 4.

Petitioner's submissions for Ms. Jesse includes a letter dated November 1, 2014, which states: "Please consider this as an invoice for services rendered for domestic and hygenic [sic] purposes to and for" petitioner between November 2013 and November 30, 2014, for services which included meal preparation, dressing petitioner, house cleaning, grocery and supply shopping, laundry, doctors' appointments, yard work, ironing, and running errands. Pet. Ex. 159 at 94. Without these services, petitioner "would have had an intolerable living condition and would not have been able to maintain a susainable [sic] living condition." *Id*. The "INVOICE FOR SERVICES Domestic and Essential Living Services" lists helping petitioner get dressed, house cleaning, grocery and supply shopping, laundry, doctors' appointments, getting in and out of bed, getting on and off the toilet on occasion, making sure medications were taken on time, yard work, cooking, ironing, and running errands at a monthly rate of $645 for 13 months for a total of $8,385. *Id*. at 95. Petitioner promised to pay Ms. Jesse $645 per month for 13 months, which comes to approximately 50 hours per month or an hour and a half per day. *Id*.

The IHSS records show that Ms. Jesse was paid $3,655.62 gross for services provided to petitioner at a rate of $10.80 per hour for an average of about 57 hours every two weeks between September and December of 2014, following the initial IHSS assessment in September 2014. Pet. Ex. 174 at 639-59. In 2015, she was paid approximately $16,000 gross at $10.80 per hour for billing submitted between 41 and 55 hours every two weeks. *Id*. at 660-726. In 2016, Ms. Jesse was paid approximately $17,000 at a rate of $10.80 per hour for approximately 55 to 70 hours of care every two weeks. *Id*. at 728-802. In 2017, Ms. Jesse was paid approximately $18,000 gross at a rate of $10.80 per hour for up to 74 hours of care every two weeks. *Id*. at 808-874. In 2018, Ms. Jesse was paid approximately $16,000 gross at $12 per hour for approximately 72 hours of care every two weeks. *Id*. at 881-947. In 2019, Ms. Jesse was paid approximately $22,000 gross at a rate of $13 per hour for approximately 70 hours of care every two weeks. *Id*. at 948-1019. Ms. Jesse resumed petitioner's care in September 2022 following the death of Mr. Merrill, grossing approximately $10,000 for the remaining three months at a rate of $16 per hour for approximately 88 hours every two weeks. *Id*. at 1020-1040. In 2023, Ms. Jesse was paid approximately $25,000 until October 2024 when petitioner moved to Georgia, at a rate of $16.50 per hour for approximately 66 hours every two weeks. *Id*. at 1041-1096. She resumed petitioner's care in March 2024. The IHSS billing records filed end in August 2024 by which time Ms. Jesse had been paid approximately $16,000 gross year-to-date for the five months since petitioner's return at $18.15 per hour for approximately 102 hours of care every two weeks.[14] *Id*. at 1097-1126, 1099.

An IHSS form completed by petitioner documents that he worked from August 2013 after his vaccination through July 15, 2014, although his hours were subsequently reduced until he stopped working in July 2014. Pet. Ex. 174 at 9; Tr. Entitle. at 102.

Petitioner was unable to explain how he arrived at $645 per month other than to say that Ms. Jesse was his housemate in 2013 and 2014 and shared the rent and responsibilities for the house. Ms. Jesse declared that she initially agreed to a "flat fee" of $645 per month "which reflected my half of the rent where we lived." Pet. Ex. 189 at 2. However, she submitted an invoice for 2013 to 2014 for 13 months at a rate of $645 per month for a total of $8,385. This amount was ultimately reduced to $6,772.50 after Ms. Jesse deducted payment she received from IHSS for

---

[14] Mr. Merrill was paid by IHSS from December 1, 2019, through August of 2022. Pet. Ex. 174 at 430-636.

September, October, and November of 2014. *Id*. at 2; Pet. Ex. 159 at 94-95.

It is unclear what, if any, assistance petitioner required between the fall of 2013 through September 2014 when IHSS conducted its assessment providing five hours a day of in-home care for disabilities resulting from petitioner's various comorbidities. Petitioner's medical records show that following what was initially thought to be GBS in September 2013, petitioner was released from the hospital and returned to work until he suffered another event a few weeks later and was ultimately diagnosed with CIDP. Following treatment, petitioner returned to work until he could no longer work in July 2014 due to his condition. According to Ms. Jesse's statements, she accepted a flat rate of $645 per month to assist petitioner, which reflected her half of the rent. However, she claims she is owed an additional $645 per month for November 2013 through August 2013 for a total of $6,772.50. Pet. Ex. 189 at 2; Pet. Ex. 176. By Ms. Jesse's own account, she was living rent-free in exchange for assisting petitioner. She therefore is owed nothing for 2013 to 2014.

Petitioner now lives in Ms. Jesse's home. Tr. 60. Ms. Jesse is a corporate accountant, but it is unclear whether she works from home or if she works full-time. Tr. 54-55. Ms. Jesse and petitioner have been friends for many years. Petitioner claims that when Ms. Jesse's son moved out in March of 2024, petitioner moved back to Sacramento from Georgia into Ms. Jesse's son's room. Tr. 60-61.

The records filed reflect that Ms. Jesse is and has been paid by IHSS since September 2014, but for the time during which petitioner lived with Mr. Merrill or was in Georgia. Ms. Jesse has billed and has been paid for the maximum number of hours provided by IHSS based on its assessments of petitioner's disabilities and needs collectively for his comorbidities. Tr. 55, 73. In addition to what Ms. Jesse lists as the care she provides, which mirrors those items contained in the IHSS assessment of care to be provided, she also pays his bills, schedules his appointments, and essentially handles all of petitioner's obligations of daily living so that he does not have to. Resp. Ex. DD; *see* Pet. Ex. 201; Pet. Ex. 196; Pet. Ex. 193; Pet. Ex. 190; Pet. Ex. 189.

Ms. Jesse has a personal agreement with petitioner for time spent caring for him above what IHSS provides. Petitioner lives in Ms. Jesse's house; therefore, her availability to him, when she is not working her day job, is whenever he wants or needs help. The additional services Ms. Jesse provides, with the exception of paying petitioner's bills, taking his blood pressure, and providing physical therapy, all fall under the domestic services listed by and paid for by IHSS, which does not require excess hours beyond what IHSS is paying. If one considers that there are approximately 720 hours in a month and that a person sleeps between seven and eight hours per night, or about 240 hours per month, works full time, or as Ms. Jesse submitted, 160 hours per month, and is paid for approximately 186 hours by IHSS per month, there remain only 33.5 hours per week to attend to one's own personal life. Ms. Jesse claims she devotes a majority of this time to petitioner. Petitioner does not require 24-hour medical care and many of the services being provided by Ms. Jesse are not medically required or reasonably associated with petitioner's vaccine-related injury. Therefore, the hours exceeding what Ms. Jesse was being paid by IHSS for the care it deemed necessary for petitioner based on his comorbidities is for petitioner to bear, not the Vaccine Program.

Petitioner's request for payment of Ms. Jesse's excess hours caring for him is denied.

### ii.  Ms. Jones and Ms. Marmolejo

Petitioner hired Ms. Jones and Ms. Marmolejo to provide 24-hour-per-day care, knowing that he was ineligible for any aid from Georgia when he chose to move there. Tr. 72, 58-60. Ms. Jones and Ms. Marmolejo filed declarations that they provided services to petitioner in exchange for his promise to submit their billing records to the Vaccine Program for payment. Whether petitioner promised that, by submitting their invoices to the Vaccine Program, the Program would pay or may pay is unknown. However, Ms. Jones' and Ms. Marmolejo's personal arrangement with petitioner that they would work for only the promise that the Vaccine Program might one day pay them was their decision. That they may not receive Program funds for this work was a risk they were willing to take.

At the time petitioner decided to move to Georgia, he was receiving 175.18 hours per month of in-home services from IHSS. The IHSS assessment in 2023 documented that petitioner was living alone at that time and that Ms. Jesse, who was being paid by IHSS for providing care, lived locally for assistance if needed. Pet. Ex. 174 at 352. Petitioner was therefore not receiving 24-hour-per-day care at the time he moved to Georgia. He was not living with Ms. Jesse or any caretaker. Pet. Ex. 174 at 385-90. Had petitioner stayed in Sacramento between October 2023 and March 22, 2024, IHSS would have paid for the hours of assistance he needed.

Petitioner lived in Georgia from October 2023 until March 22, 2024. In March 2024, respondent's counsel advised that petitioner's life care plan would need to be updated to reflect his living in Georgia. He then, as Ms. Jones and Ms. Marmolejo declared, "fairly suddenly" returned to California on March 22, 2024. Pet. Ex. 182 at 2; Pet. Ex. 181 at 2. Petitioner incurred expenses moving to Georgia knowing he would not receive any government assistance once there in a state in which knew no one. He then chose to hire or was provided with individuals to assist him on a 24-hour-per-day basis by the Church. The costs associated with those decisions are petitioner to bear. Petitioner promised to pay Ms. Jones and Ms. Marmolejo by submitting their bills to the Vaccine Program. That was a personal arrangement he made and not an obligation to be paid by the Program.

Petitioner's request for payment of Ms. Jones' and Ms. Marmolejo's hours caring for him is denied.

### 2.  Moving Expenses

Petitioner seeks reimbursement for the costs associated with moving to Georgia which include: $403.92 for two rooms at the Hampton Inn; $85.80 for meals for Jones, Marmolejo, and petitioner; $125.00 for shipping baggage through Southwest Airlines; $148.98 for a flight via Southwest Airlines for petitioner; $515.92 for Southwest Airlines tickets for Jones and Marmolejo; $263.50 for a UPS shipment of household items; and $97.12 for another UPS shipment of household items, for a total of $1,640.24. Resp. Ex. DD. Apparently Ms. Jones and Ms. Marmolejo flew to California and assisted petitioner to Georgia. Petitioner argues that the move was necessitated by his lack of adequate funds to remain in Sacramento which would have rendered

him homeless, adding that "[b]ut for his vaccine injury, he would not have lost his job and income to pay for his rent." ECF No. 220 at 6; Pet. Ex. 138. Therefore, his moving expenses were "incurred" and are "vaccine related" and were for "related travel expenses in order to move to a new resident [sic] and receive appropriate care." *Id*.

Petitioner advised that he tried to secure government funding to stay in Sacramento but was advised that he would be homeless and should move to another state, with Georgia suggested. Tr. 7-11, 52. Petitioner confirmed that he lived in the same rental home in Sacramento for over 15 years until he moved to Georgia in October of 2023. His vaccine-related injury occurred in 2013. Ms. Jesse was his housemate, and they shared the rent and household chores until she moved out in 2017 or 2018. Tr. 52-53 (He did not mention Ms. Jesse providing any care during that time). His friend Scott Murrow and his mother provided financial assistance for petitioner's rent after that. Tr. 52. Mr. Merrill was petitioner's housemate until he passed away. Mr. Merrill was paid by IHSS for providing care services to petitioner during the time that Mr. Merrill lived with petitioner. Ms. Jesse provided care thereafter being paid by IHSS. She did not live with petitioner. Tr. 53.

Petitioner argued that, when faced with an 8.3% increase of his rent, he was forced to move to Georgia. Tr. 51. Petitioner filed letters and lease agreements showing his rent increases for the lease term beginning on December 1, 2021, of 4.3% to $1,500 per month and a second increase for the lease term beginning on December 1, 2022, of 8.3% to $1,625 per month. Petitioner did not file any documentation related to a rent increase after December 1, 2022. He did not move to Georgia until October 2023, a year after the alleged 8.3% increase. He then returned to Sacramento five months later on March 22, 2024, just days before the life care planners were scheduled to make a home visit to Georgia to revise his life care plan. Tr. 53-54. Petitioner stated that it was around that time that Ms. Jesse advised him that her son had moved out and he should come back to Sacramento and live at her house because he was unhappy in Georgia. Tr. 54.

Petitioner's argument that his move to Georgia was the result of his CIDP causing him to lose his job and his home is unpersuasive. Petitioner stopped working in July 2014 and remained in his rental home until October 2023. He provided no persuasive support that his move to Georgia was reasonably necessary under the act for diagnosis, medical or other remedial care, or for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavior therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities as set forth in § 15(a)(1)(A)-(B). Petitioner moved to Georgia in October 2023, 10 years after his vaccine-related injury, nine years after he stopped working, and a full year after he claimed that an 8.3% rent increase forced him out of the rental property he had lived in for over 15 years, apparently alone since the death of Mr. Merrill. Petitioner moved to Georgia knowing he was not qualified for any government services, particularly in-home care. Once in Georgia, he was also unable to receive IVIG treatment and was provided only with Hizentra administered subcutaneously, which by all accounts was ineffective and resulted in his overall health declining. He is unable to satisfy the requirements of § 15(a)(1)(A)-(B).

The costs of petitioner's move to Georgia does not comply with the requirements of the Act and are therefore not compensable. Petitioner's request is denied.

### 3. Lawn Care for 2022 and 2023

Petitioner seeks reimbursement of $1,200 for lawn care for his rental property in Sacramento for the years 2022 and 2023. Petitioner argues that, due to the impact of his CIDP, he was unable to do the tasks that he previously performed. ECF No. 220 at 8.

Respondent argues that petitioner's injury was sustained well over 10 years prior to incurring these costs. Additionally, lawn care expenses have been ruled non-compensable.

Petitioner had lived in his rental property for many years and specifically for at least 10 years after receipt of the subject flu vaccine and injury in August 2013. Pet. Ex. 159 at 95-104. While testifying at the damages hearing in support of his intentions of buying a home with the proceeds from this case, petitioner acknowledged that all costs associated with home ownership, including water, gardening, and fixing things when they break, would be costs borne by him that he was prepared to take on. Tr. 50. According to petitioner, even though he did not own the rental property he lived in, he assumed responsibility for the care of that property as part of his agreement with his landlord. He took care of that property for many years following his vaccine-related injury. Petitioner hired someone to do the lawn care after the death of Mr. Merrill who, like Ms. Jesse, assisted petitioner with the property as part of living in the house.

Costs for the routine tasks of home rental or ownership, such as housekeeping or lawn care services, are typically not reimbursable by the Program. *See Curri v. Sec'y of Health & Hum. Servs.*, No. 17-432, 2018 WL 6273562, at *3 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). This was confirmed in emails to petitioner by his counsel that lawn care is an ordinary expense. Pet. Ex. 159 at 92. However, where the "category of service" at issue "directly implicates the limitations placed on Petitioner by his injury," courts have awarded costs associated with lawn care services. *Grant v. Sec'y of Health & Hum. Servs.*, No. 20-1262V, 2024 WL 940275, at *8 (Fed. Cl. Spec. Mstr. Feb. 9, 2024) (finding reimbursement for lawn care services to be reasonable in the context of a flu/GBS petitioner with significant diabetes-related comorbidities). And, as Ms. Curtis testified, often when she prepares plans for the elderly who previously engaged in their own lawn care and can no longer do so, she provides for that in her plan.

Here, and specific to the bills submitted for the 2022 and 2023 season, petitioner had previously done the lawn care on the rental property at which he lived form many years as part of his agreement with the landlord. Due to the various medical conditions that affect his physical abilities, including his CIDP, as the years went on following his 2013 vaccine-related injury, petitioner became unable to complete these tasks and Mr. Merrill was doing them. Once Mr. Merrill passed, petitioner had to hire someone for the lawn care so petitioner could comply with his lease terms. Tr. 41, 52. Therefore, petitioner will be reimbursed the $1,200 for the past lawn care services.

### 4. Unrelated Medical Expenses, Disputed Mileage, and Various Prescriptions

The following medical expenses totaling $431.99 are in dispute: a visit with Dr. Gonzalez on November 12, 2023, for $31.80 (Pet. Ex. 139); an eyecare appointment billed on October 2,

2024 for $27.72;[15] two bills submitted for visits on the same day with Dr. Carroll dated April 30, 2024, one for $27.91 and the second for $27.51;[16] and a visit at Wakefield Foot and Ankle in Georgia on February 7, 2024, for $317.05,[17] *See* Resp. Ex. DD at 5-6.

A search of the medical records revealed that Dr. Gonzalez is a neurologist at Hamilton Medical Center in Georgia who it appears petitioner saw for epinephrine injections for allergy desensitization therapy. *See* Pet. Ex. 139 at 1-5. There were no bills submitted for these visits.

There was no record filed for Wakefield Foot and Ankle and no explanation for the services provided or proof of payment for $317.05. Nor could I find any record associated with visits to Dr. Carroll on April 30, 2024, only visits with Dr. Belsky and Dr. Shaoulian in April 2024. And I could not locate any examinations associated with petitioner's eyes on October 2, 2024.

Without records or proof of payment these bills cannot be reimbursed.

Petitioner submitted for reimbursement for the following medications for a total of $32.65: atorvastatin, or Lipitor, a statin to lower cholesterol; fluticasone propionate, a Vitamin D nasal spray; hydrochlorothiazide, a diuretic for high blood pressure; metoprolal succinate, a beta blocker for high blood pressure; and tamsulasin, an alpha blocker for enlarged prostate. None of these medications treat CIDP. Nor has petitioner demonstrated that they are related to his vaccine injury. Therefore, they are not reimbursable.

Finally, petitioner submits $2,851.27 for mileage to doctors' appointments. Respondent agreed to $2,810.47 for mileage, concluding that some visits were not CIDP related. The difference between petitioner's and respondent's mileage amounts is $40.80. A review of the list and the associated medical records show that these medical visits were, for the most part, unrelated to petitioner's CIDP. His visit to Dr. Gonzalez in Georgia for $7.62, while for desensitization with epinephrin, lists CIDP as his diagnosis and therefore the $7.62 will be awarded. Petitioner is awarded $2,818.09 for mileage.

## V.    Conclusion

In light of the above analysis, and in consideration of the record as a whole, I find that petitioner shall be awarded a lump sum of $240,000 for pain and suffering, agreed lost earnings of $336,475; the agreed-upon Medi-Cal lien of $1,906,249.80, to be updated; out-of-pocket expenses of $9,270.32, consisting of $2,818.09 in mileage, $1,200 for lawn care, and $5,252.23 in agreed-upon expenses; and monies sufficient to fund petitioner's life care plan as detailed above.

**By July 14, 2026,** the parties shall file a joint status report (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, and (2) confirming that all items of damages have now been resolved and that no issues remain outstanding. Thereafter, a damages decision will issue.

---

[15] There are no medical records or a service date provided for this visit.
[16] No record was filed for these bills.
[17] No bill or proof of payment was filed.

**IT IS SO ORDERED**.

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master